Anthony MATTHEWS, Plaintiff,

v.

The **NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,**
Defendant.

No. CS–99–0264.

United States District Court,
E.D. Washington.

Oct. 23, 2001.

Richard H. Wooster, Mann Johnson Wooster & McLaughlin PS, Tacoma, WA, for Plaintiff.

Paul Renwick Taylor, Brynes & Keller, Paul R. Raskin, Corr Cronin LLP, Seattle, WA, for Defendant.

ORDER

WM. FREMMING NIELSEN, District Judge.

On October 27, 2000, Plaintiff filed a Motion for Summary Judgment. Defendant responded by filing an Opposition to Plaintiff's Motion for Summary Judgment and a Cross Motion for Summary Judgment. Richard Wooster filed briefs on behalf of Plaintiff, and Paul Taylor and William Walsh filed briefs on behalf of Defendant. On September 18, 2001, the Court heard oral argument on the Motions and asked the parties to file supplemental briefing on the issue of mootness. The Court has reviewed the file, the Motions, the supplemental briefing, and the applicable law, and for the reasons discussed below grants in part and denies in part Plaintiff's Motion for Summary Judgment, and also grants in part and denies in part Defendant's Cross Motion for Summary Judgment. Because Plaintiff's ADA claim has become moot, however, the Court dismisses that claim with prejudice and dismisses Plaintiff's state law claim—over which the Court had supplemental jurisdiction—without prejudice.

## I. PROCEDURAL BACKGROUND

Plaintiff Anthony Matthews initially filed his Complaint and a Motion for a Temporary Restraining Order and Preliminary Injunction in U.S. District Court for the Western District of Washington on September 15, 1999. Plaintiff, who has a diagnosed learning disability, alleged in his Complaint that the National Collegiate Athletic Association [NCAA] violated the Americans with Disabilities Act [ADA] and the Washington Law Against Discrimination when it declared him academically ineligible to play intercollegiate football. Judge Franklin Burgess transferred venue to this Court pursuant to 28 U.S.C. § 1391(b)(2) on September 23, 1999. On October 5, 1999, Senior Judge Justin Quackenbush issued a Temporary Restraining Order, enjoining Defendant from declaring Plaintiff academically ineligible to participate in intercollegiate football games and practices. On October 22, 1999, this Court issued an Amended Temporary Restraining Order adding new Defendants Washington State University [WSU] and the PAC–10 Athletic Conference. Then, on December 1, 1999, after the parties filed additional briefing and presented oral argument on Plaintiff's Motion for a Preliminary Injunction, the Court vacated the Temporary Restraining Order and denied Plaintiff's request for an injunction. The Court found that Plaintiff could not show a likelihood of success on the merits on any of his claims. Nine months later, the Court approved a Stipulated Order dismissing Defendants PAC–10 and Washington State University without prejudice. Plaintiff subsequently filed the instant Motion for Summary Judgment, and Defendant NCAA responded

with its Cross Motion for Summary Judgment.

In January, 2001, before considering the pending Motions, the Court became aware that the U.S. Supreme Court had issued a writ of certiorari in a Ninth Circuit case dealing with the application of the ADA to disabled athletes. *Martin v. PGA Tour, Inc.*, 204 F.3d 994 (9th Cir.2000), *cert. granted*, 530 U.S. 1306, 121 S.Ct. 30, 147 L.Ed.2d 1052 (2000). Based on the possibility that the Supreme Court's decision in the *Martin* case might affect the rulings in the pending Motions in this case, the Court stayed the summary judgment hearing date until issuance of the Supreme Court's *Martin* decision; the parties did not oppose the stay. The Supreme Court issued its opinion on May 29, 2001. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001). The parties in this case then submitted supplemental briefing on issues raised by the *Martin* case, and the Court renoted the hearing on Plaintiff's Motion for Summary Judgment and Defendant's Cross Motion for July 27, 2001. The Court subsequently set oral argument for September 18, 2001.

## II. FACTS [1]

■ Plaintiff Anthony Matthews, a college student initially enrolled at WSU, filed this lawsuit when Defendant NCAA declared him academically ineligible to play intercollegiate football during the 1999 season. (Def.'s Statement of Facts, Ex. 4 at 2.) Plaintiff began his college career at WSU in 1997 and played on the WSU football team during the 1998 season. (Def.'s Statement of Facts, Ex. 1 at 2.)

---

**1.** These facts can be found in the parties' Statements of Material Facts, submitted with briefing on the pending Motions pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1. The Court deems admitted any material fact asserted by a party and not rebutted by the opposing party. The parties agree on the facts recited in this section, except where otherwise noted.

*Purpose of NCAA.* The NCAA is a voluntary association, comprising approximately 1,200 member institutions, that administers intercollegiate athletic programs. According to the NCAA Manual, the association's basic purpose is "to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports." (Def.'s Statement of Facts, Ex. 10 at 2.) The NCAA also lists the following as some of its specific purposes: promoting educational leadership, developing physical fitness, and stimulating athletics participation as a recreational pursuit. (Def.'s Statement of Facts, Ex. 10 at 2.)

*NCAA Control over University Athletic Facilities.* The NCAA exercises little, if any, control over the operation of athletic facilities such as college football stadiums. (Def.'s Statement of Facts, Ex. 5 at 2.) The NCAA rules do not prevent students from using university athletic facilities when those facilities are not being used for organized practices and games. (Def.'s Statement of Facts, Ex. 5 at 2.) The NCAA does not control university sports facilities' hours of operation, staffing, management, or access to the public. (Def.'s Statement of Facts, Ex. 5 at 2.) The member institutions schedule competitions, set ticket prices for regular season events, determine concession prices, manage concession sales, and control any broadcasts of athletic events during the regular seasons. (Def.'s Statement of Facts, Ex. 5 at 3.) The NCAA also receives no revenue from use of the facilities during the teams'

regular seasons. (Def.'s Statement of Facts, Ex. 5 at 2; Ex. 8 at 8.)

The association does, however, obtain revenue from bowl games in which its member institutions participate. (Def.'s Statement of Facts, Ex. 5 at 2; Ex. 8 at 8.) The NCAA bylaws also dictate the length of the playing seasons, the number of games, and the number of hours student-athletes may practice each week. (Def.'s Statement of Facts, Ex. 5 at 3.) Additionally, the NCAA publishes rules of play governing intercollegiate athletics, supervises regional and national athletics events, and establishes eligibility standards for athletics events. (Def.'s Statement of Facts, Ex. 10 at 2.)

*NCAA Eligibility Rules.* As part of its eligibility standards, the NCAA imposes certain academic requirements for its member institutions' student-athletes. (Def.'s Statement of Facts, Ex. 5 at 1; Wooster Decl. Supp. Summ. J., Ex. 1 at 2–3.) A student-athlete's failure to meet the requirements can result in the NCAA declaring the athlete ineligible to participate in intercollegiate sports. (Def.'s Statement of Facts, Ex. 4 at 3.) For example, under NCAA eligibility rules, student-athletes must maintain a college grade point average of at least 1.8 and must attain 25 percent of the credit hours required for a degree by the completion of their second year of college enrollment. (Wooster Decl. Supp. Summ. J., Ex. 1 at 3.)

Another eligibility rule requires that student-athletes earn 75 percent of their annual required credit hours during the regular academic year. (Wooster Decl. Supp. Summ. J., Ex. 1 at 3.) The NCAA defines the "regular academic year" as "the time beginning with the opening of the institutions' fall term and concluding with the institutions' spring commencement exercises." (Pl.'s Mem. Supp. Summ. J. at 2, citing NCAA Bylaw 14.4.3.1.3.1.) The NCAA established this rule, called the "75/25 Rule," in 1992 to ensure that student-athletes maintain a course load equivalent to the general student body during the normal school year. (Def.'s Statement of Facts, Ex. 5 at 2.) The NCAA promulgated the rule after various member institutions expressed concern about student-athletes' excessive use of summer school courses to maintain eligibility while taking reduced course loads during the normal school year. (Def.'s Statement of Facts, Ex. 5 at 2.) The NCAA bylaws permit waivers of certain academic eligibility requirements for a learning disabled student-athlete when the university, to accommodate the student's disability, defines full-time enrollment for that student-athlete as fewer than 12 credit hours per semester. (Pl.'s Mem. Supp. Summ. J. at 3.)

*Matthews' Learning Disability.* Plaintiff has been diagnosed with a significant learning disability. (Wooster Decl. Supp. Summ. J., Ex. 2 at 2.) According to documents submitted in support of his Motion for Summary Judgment, Plaintiff has difficulty processing information. On one reading test designed to assess his abilities, his scores ranged from the sixth to the tenth percentile. (Wooster Decl. Supp. Summ. J., Ex. 3 at 13.) His full-scale IQ ranks at the 13th percentile. (Wooster Decl. Supp. Summ. J., Ex. 2 at 9; Ex. 3 at 5–6.) In a learning disability assessment, Steven J. Kruse, Ph.D., concluded that Plaintiff displays significantly impaired performance in written language tasks and meets Washington state criteria for having a specific learning disability in written language. (Wooster Decl., Ex. 2 at 11.) Dr. Kruse noted that Plaintiff "demonstrated clear deficits in basic reading skills including word recognition, phonetic reading, and understanding of word meanings.... [B]oth expressive (writing)

and receptive (reading) are significant problems that interfere with academic achievement." (Wooster Decl., Ex. 2 at 11.) Dr. Kruse indicated that Plaintiff should therefore be actively involved with individual tutoring in order to develop more effective learning strategies. (Wooster Decl. Supp. Summ. J., Ex. 2 at 2.) The Washington State Athletics Academic Profile prepared for Plaintiff recommended that he be permitted to use a tape recorder in the classroom, have double time to complete exams, give answers to written exams orally in person or by tape recording, have another student take notes for him, and be afforded various other accommodations to assist him in succeeding academically. (Wooster Decl. Supp. Summ. J., Ex. 2 at 12.)

***Waivers to Accommodate Matthews' Disability.*** WSU granted Plaintiff an accommodation for his learning disability, permitting him to enroll in fewer than 12 credit hours while maintaining his status as a full-time student. (Wooster Decl. Supp. Summ. J., Ex. 2 at 13.) Although the NCAA generally requires student-athletes to complete at least 12 credit hours successfully each semester, in October, 1997, the NCAA granted Plaintiff a limited waiver of this requirement based on his learning disability; in order to maintain his eligibility, Plaintiff needed to complete only nine credit hours each semester during the regular school year and six credit hours during the summer session. (Def.'s Statement of Facts, Ex. 4 at 3; Wooster Decl. Supp. Summ. J., Ex. 5.) The following year, in August, 1998, Defendant also granted Plaintiff a waiver of the 75/25 Rule and permitted him to obtain more than 25 percent of his required credits during the summer academic session. (Def.'s Opp'n to Summ. J., at 12.) During the 1998–99 regular academic year, Plaintiff attempted 22 total credit hours over two semesters but successfully completed only 16 of those. (Wooster Decl. Supp. Summ. J., Ex. 2 at 2–3.) During the summer session, Plaintiff attempted and successfully completed nine credit hours. (Wooster Decl. Supp. Summ. J., Ex. 2 at 3.) This resulted in the accumulation of 25 credit hours toward his degree during the calendar year, one more than required under the NCAA's waiver of course load requirements. (Def.'s Statement of Facts, Ex. 4 at 3; Wooster Decl. Supp. Summ. J., Ex. 5.) Nevertheless, after denying Plaintiff's request for a second waiver of the 75/25 Rule, the NCAA declared him academically ineligible because he failed to earn at least 75 percent of those credit hours during the regular academic year. (Def.'s Opp'n Summ. J., at 13.) Although Plaintiff failed to meet that requirement, he had earned a cumulative grade point average of 2.3 at the conclusion of the 1999 summer session, compared to the 1.8 minimum required by the NCAA, and had completed 39 percent of the credits needed for his degree, compared to the NCAA's 25 percent requirement. (Def.'s Statement of Facts, Ex. 2; Wooster Decl. Supp. Summ. J., Ex. 2 at 3.)

Plaintiff says that although he worked extensively with the WSU tutorial center, he simply could not meet the 75/25 Rule's requirement that he complete no more than 25 percent of his credits during summer session. (Wooster Decl. Supp. Summ. J., Ex. 2 at 4–5.) Defendant, however, asserts that Plaintiff's failure to meet the 75/25 Rule's eligibility requirement should be attributed to his lack of effort, not to his learning disability. Defendant also asserts that Plaintiff's academic performance deteriorates when playing football, and Defendant submits documentation showing that Plaintiff's grades worsened during the autumn 1998 football season. (Def.'s Statement of Facts, Ex. 2.) Defendant also presents evi-

dence that in one criminal justice class, Plaintiff attended lecture only half of the time. (Def.'s Statement of Facts, Ex. 7.) After the NCAA declared Plaintiff ineligible to compete in intercollegiate football at WSU, Plaintiff subsequently transferred to Eastern Washington University [EWU], where he continues to be under the jurisdiction of the NCAA's student-athlete eligibility requirements. (Wooster Decl. Supp. Summ. J. at 2.) Since transferring, Plaintiff has qualified to play football at EWU and has retained his academic eligibility; he recently began his fourth season playing intercollegiate football. (Pl.'s Supplemental Mem. Regarding Case in Controversy at 2.) NCAA bylaws prohibit any student-athlete from competing in intercollegiate athletics for more than four seasons over a five-year period. (Decl. of Paul R. Taylor, Ex. A at 7.)

## III. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment must show that no genuine issue of material fact exists and that the Court should grant judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir.1982). The Court must construe all facts and all justifiable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

## IV. LAW OF THE CASE DOCTRINE

In a prior Order denying Plaintiff's Motion for a Preliminary Injunction, this Court already evaluated the merits of Plaintiff's case. *See Matthews v. Nat'l Collegiate Athletic Ass'n*, 79 F.Supp.2d 1199 (E.D.Wash.1999). That prior Order triggers the law of the case doctrine, which generally precludes a court from reconsidering issues previously decided in the same case. *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir.1997). The law of the case doctrine does not bind a court as absolutely as res judicata. *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 833 (9th Cir.1982). The doctrine does not limit a court's power but provides "a guide to discretion." *Alexander*, 106 F.3d at 876. The Supreme Court has recognized this doctrine as a general principle that "courts should be loath to [revisit prior decisions in a case] in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983).

The Ninth Circuit has held that the law of the case doctrine applies to all legal and factual issues already decided by the same court or a higher court, even prior to entry of a judgment, unless a specific exception to the doctrine applies. *Pit River Home & Agric. Coop. Ass'n v. United States*, 30 F.3d 1088 (9th Cir.1994). A court may exercise its discretion to depart from the law of the case where one of the following exceptions applies: "(1) the first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) the evidence on remand is substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result." *Mendenhall v. Nat'l Transp. Safety Bd.*, 213 F.3d 464, 469 (9th Cir.2000). Otherwise, failure

to apply the law of the case constitutes an abuse of discretion. *Alexander,* 106 F.3d at 876. (citing *Thomas v. Bible,* 983 F.2d 152, 155 (9th Cir.1993)).

Since December 1, 1999, when this Court issued its Order denying Plaintiff's Motion for a Preliminary Injunction, many cases have evaluated Title III of the ADA, including its application to sports organizations generally and the NCAA specifically. Therefore, in ruling on the present Motions for Summary Judgment, the Court considers any cases decided after December 1, 1999, and evaluates the impact any intervening change in the law might have on the instant case.

## V. DEFINITION OF "PUBLIC ACCOMMODATION" UNDER THE ADA

■ Plaintiff brings his ADA claim under Title III of the ADA. Title III prohibits discrimination in public accommodations based on disability. The statute provides as follows:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a) (1994). The ADA also provides guidance on what constitutes a "public accommodation."

The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce—

. . . . .

(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(D) an auditorium, convention center, lecture hall, or other place of public gathering;

. . . . .

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

. . . .

(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. § 12181(7) (1994). *See also* 28 C.F.R. § 35.104 (2000). According to the legislative history of the ADA, as discussed this year by the U.S. Supreme Court, the statute's enumerated categories "should be construed liberally." S. REP. NO. 101–116, at 59 (1989); H.R. REP. NO. 101–485, pt. II, at 100 (1990), *quoted in PGA Tour, Inc., v. Martin,* 532 U.S. at ——, 121 S.Ct. 1879, 1889 n. 25. Furthermore, by enacting the ADA, Congress provided a "broad mandate" with a "sweeping purpose." 532 U.S. at ——, 121 S.Ct. at 1889. Title III provides a "comprehensive definition" of public accommodation and a "broad general rule." *Id.*

***Necessity for Physical Place or Location.*** In recent years, many cases have addressed the ADA's definition of a "public accommodation." Federal courts have struggled with the issue of whether Title III applies to organizations and services not directly linked to a physical place or facility.[2] Since the Court evaluated this

**2.** Several courts have held that Title III applies only to actual places, and that membership organizations are not subject to Title III. *See, e.g., Elitt v. U.S.A. Hockey,* 922 F.Supp. 217, 223 (E.D.Mo.1996) (holding that hockey organization was not sufficiently linked to a "place," so not subject to ADA); *Brown v. 1995 Tenet ParaAmerica Bicycle Challenge,*

issue in its Order denying Plaintiff's Motion for a Preliminary Injunction, the Ninth Circuit has published an opinion providing some additional guidance to courts applying Title III. In *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir.2000), the Ninth Circuit, following the Third and Sixth Circuits, held that before applying Title III, courts must evaluate whether some connection exists between a physical place and the private entity employing allegedly discriminatory practices. In *Weyer*, the court held that while insurance offices must be accessible to disabled people, insurance companies administering employer-provided insurance policies need not provide policies that treat disabled and non-disabled people the same. *Id.* The court noted that employer-provided insurance policies had no relation to any insurance company's office open to the public. *Id.* at 1114–15. Although several opinions have applied the *Weyer* reasoning to ADA claims against insurance policies,[3] the Ninth Circuit has yet to address whether its reasoning might extend to other entities. Furthermore, no Ninth Circuit opinions have articulated any specific test or factors a court should consider when assessing the extent to which a private entity must be connected to a physical place to qualify the entity as a "public accommodation" subject to the ADA. The Sixth and Third Circuits— courts the Ninth Circuit followed explicitly on this issue—have held that in order for Title III of the ADA to apply, some "nexus" must exist between the physical place of public accommodation and the services or privileges denied in a discriminatory manner. *Menkowitz v. Pottstown Mem. Med. Ctr.*, 154 F.3d 113, 120 (3d Cir.1998) (holding that hospital's denial of staff privileges to disabled doctor violated Title III because ADA applies not only to members of the public seeking medical services but also to those wishing to work as doctors within hospital), *discussed with approval in Martin v. PGA Tour, Inc.*, 204 F.3d 994, 998 (9th Cir.2000). *See also Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1011 (6th Cir.1997) (en banc).

### *Application of Title III to the NCAA.*[4]

Although the Ninth Circuit has yet to articulate a clear test for defining what constitutes a public accommodation under the

959 F.Supp. 496, 498–99 (N.D.Ill.1997) (holding that group organizing bike race was not subject to ADA); *Stoutenborough v. Nat'l Football League*, 59 F.3d 580, 583 (6th Cir. 1995) (holding that National Football League was not a "place" and therefore not subject to ADA).

Other courts have held, however, that the term "public accommodation" also applies to services, privileges, and other intangibles independent of a physical place. *See, e.g., Tompkins v. United Healthcare of N.E., Inc.*, 203 F.3d 90, 95 n. 4 (1st Cir.2000); *Carparts Distrib. Ctr., Inc., v. Auto. Wholesaler's Ass'n, Inc.*, 37 F.3d 12, 18–20 (1st Cir.1994) (holding that "public accommodation" within meaning of Title III of ADA includes more than actual physical structures).

3. *See, e.g., Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1047 (9th Cir.2000) (holding that insurance company administer-

ing employer-provided disability plan was not "place of public accommodation" under ADA because employees received their benefits through employment, not through a public accommodation); *Van Hulle v. Pac. Telesis Corp.*, 124 F.Supp.2d 642, 644 (N.D.Cal.2000) (same).

4. For background on this subject, *see generally* Maureen A. Weston, *Academic Standards or Discriminatory Hoops? Learning–Disabled Student–Athletes and the NCAA Initial Academic Eligibility Requirements*, 66 Tenn. L. Rev. 1049 (1999); Jonathon R. Cook, *The Americans with Disabilities Act and Its Application to High School, Collegiate and Professional Athletics*, 6 Vill. Sports & Ent. L.J. 243 (1999); Robert J. Adelman, Case Note and Comment, *Has Time Run Out for the NCAA? An Analysis of the NCAA as a Place of Public Accommodation*, 8 DePaul-Lca J. Art & Ent. L. & Pol'y 79 (1997).

ADA, it recently has provided strong indications that the NCAA would qualify as a public accommodation under the ADA. One case represents the most significant developments in Title III law since this Court's last substantive Order: *Martin v. PGA Tour, Inc.,* 204 F.3d 994 (9th Cir. 2000),[5] aff'd, 532 U.S. 661, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001).[6] In the *Martin* case, the Ninth Circuit and the Supreme Court held that the PGA Tour must modify its rules to permit a disabled golfer to use a golf cart while competing in tournaments sponsored by the PGA Tour. 204 F.3d at 1002. Although not specifically addressing the NCAA, the reasoning employed in the *Martin* opinions provides guidance to courts evaluating the ADA's application to athletic events.

Many decisions involving whether Title III applies to sports organizations have focused on the degree to which the organization exercises control over spectators' access to a sports facility; the Ninth Circuit's and the Supreme Court's decisions in *Martin,* however, require an expanded analysis. While prior decisions by other courts have focused largely on a private entity's control over the public spectator areas of a "place of public accommodation," the decisions in *Martin* also recognize that control exerted over access to the field of play can subject a private entity to ADA requirements. 532 U.S. at ——, 121 S.Ct. at 1890 ("[T]he underlying premise of the cases dealing with disabled student-athletes is that Title III applies to the playing field, not just the stands."). *See also Olinger v. United States Golf Ass'n,* 205 F.3d 1001, 1004–05 (7th Cir.2000), rev'd, —— U.S. ——, 121 S.Ct. 2212, 150 L.Ed.2d 207 (2001) (holding that the competitive area of golf course used for U.S. Open did constitute a place of public ac-

commodation). The Ninth Circuit in *Martin I* noted that the PGA Tour could not escape ADA liability by attempting to "compartmentalize" the spectator areas and the competitive areas of a golf course used for a tournament; the court insisted on evaluating both areas as places of public accommodation. 204 F.3d at 998. The Supreme Court echoed that reasoning. 121 S.Ct. at 1891.

Although the *Martin* case did not relate specifically to the NCAA, the Ninth Circuit provided a very strong indication that it would apply Title III of the ADA to the NCAA just as it did to the PGA Tour. In *Martin* the Ninth Circuit cited with approval three district court opinions that applied the ADA to the NCAA: *Ganden v. Nat'l Collegiate Athletic Ass'n,* No. 96 C 6953, 1996 WL 680000 at *10 (N.D.Ill. Nov. 21, 1996); *Tatum v. Nat'l Collegiate Athletic Ass'n,* 992 F.Supp. 1114 (E.D.Mo. 1998); and *Bowers v. Nat'l Collegiate Athletic Ass'n,* 9 F.Supp.2d 460 (D.N.J.1998). 204 F.3d at 998.

In *Ganden,* the district court held that the NCAA could be sued under the ADA. 1996 WL 680000, at *10. The district court applied a two-part test, articulated by the Seventh Circuit, requiring a plaintiff suing under Title III to show that (1) the private entity is affiliated with a particular facility and (2) membership in or certification by the private entity acts as a "ticket" for admission at that facility. *Id.* (citing *Welsh v. Boy Scouts of Am.,* 993 F.2d 1267, 1271 (7th Cir.1993)). The *Ganden* court held that the NCAA's certification of eligibility acts as an admission ticket to the playing field for members of the public who want to play college athletics. *Id.* The court found that member institutions constructed the athletic facilities pri-

---

**5.** Hereinafter referred to as *Martin I.*

**6.** Hereinafter referred to as *Martin II.*

marily for NCAA competition, and the NCAA governed those competitions and relied on use of the facilities. Although the plaintiff in *Ganden* did not allege that the NCAA owned or leased the university's athletic facility, the court nonetheless found that where more than one entity exercises control over access to a place of public accommodation, both entities can be liable for discrimination prohibited by the ADA. *Id.* at *11. *Ganden* therefore held that the NCAA could be subject to Title III of the ADA. *Id.* at *10. Although this Court distinguished *Ganden*'s holding in the Order denying Plaintiff's Motion for a Temporary Injunction, at that time the Ninth Circuit had not cited *Ganden* with approval. *Martin,* 204 F.3d at 998. Furthermore, as discussed above, the Supreme Court's holding in *Martin* indicates that the ADA requires a broader inquiry, such as that applied in *Ganden,* into the issue of the "control" exerted over different areas of a sports arena.

In *Tatum,* another case referenced by this Court in its prior Order but now interpreted differently in light of *Martin I,* a district court held that the NCAA's "significant contacts" with college athletic facilities subject it to Title III of the ADA. 992 F.Supp. at 1119–21. Although the court referenced NCAA control over ticket prices and facility management—facts inconsistent with the record in the instant case—the court also cited NCAA bylaws regulating athletic teams' maximum practice times, use of athletic training facilities, and coach-athlete interaction to conclude that the NCAA did exercise significant control over the athletic programs based at university athletic facilities. *Id.* at 1120. The court held that the NCAA therefore did constitute a public accommodation subject to ADA requirements. *Id.*

Several other courts also have recently applied the ADA to the NCAA. In *Bowers v. Nat'l Collegiate Athletic Ass'n,* 118 F.Supp.2d 494 (D.N.J.2000),[7] decided since this Court denied Plaintiff's Motion for a Temporary Injunction and cited with approval by the Ninth Circuit, the court held that a football player who was denied a college athletic scholarship could sue the NCAA under the ADA. The court found that the NCAA constitutes an "operator of a public accommodation" under Title III of the ADA, based on the degree of control the NCAA exerts over its member institutions. *Id.* at 514–15. The court considered evidence very similar to that presented in the instant case, showing that the NCAA sets the eligibility criteria used to determine who may compete on college athletic teams, requires member institutions to run athletic programs in compliance with NCAA rules, and governs the procedures used for investigating and punishing violations of those rules. *Id.* at 516–17. In light of those facts, the court held that the NCAA's significant control over athletic programs subjects it to the ADA's requirements. *Id.* at 517.

In *Cole v. Nat'l Collegiate Athletic Ass'n,* 120 F.Supp.2d 1060 (N.D.Ga.2000), the court dismissed the plaintiff's claim based on mootness yet discussed the issues of the case based on the implicit assumption that the ADA did apply to the NCAA. While declining to hold explicitly that ADA liability existed for the NCAA, the court assumed for purposes of analysis that Title III did apply and evaluated what modifications the NCAA should make to its rules for a learning disabled student-athlete. *Id.* at 1070. Similarly, in *Pryor v. Nat'l Collegiate Athletic Ass'n,* 153 F.Supp.2d 710, 712–13 (E.D.Pa.2001), a district court in the Third Circuit dismissed a plaintiff's

---

**7.** For other district court opinions issued in the *Bowers* case, *see* 974 F.Supp. 459 (D.N.J. 1997); 9 F.Supp.2d 460 (D.N.J.1998); 130 F.Supp.2d 610 (D.N.J.2001).

ADA claims based on lack of standing, while implicitly assuming that Title III of the ADA did apply to the NCAA.

The Ninth Circuit also recently recognized the U.S. Department of Justice's [DOJ] finding that the NCAA violated Title III of the ADA. *Butler v. Nat'l Collegiate Athletic Ass'n,* 2001 WL 50535 (9th Cir.2001). As a result of a lawsuit filed by a learning-disabled football player at the University of Washington, as well as other complaints by student-athletes with learning disabilities, the DOJ investigated NCAA procedures and eligibility standards and determined that the association had violated Title III of the ADA. *Id.* As a result of the investigation, the NCAA entered into a consent decree with the DOJ, agreeing to revise certain policies relating to learning-disabled student-athletes. Weston, 66 TENN. L. REV. at 1093.

▇ The intervening change in the law related to the ADA and the NCAA creates an exception to the law of the case doctrine and permits this Court to reconsider its prior decision that the ADA does not apply to the NCAA. At the time of the Court's December 1, 1999, Order, neither the Ninth Circuit's nor the Supreme Court's decision applying the ADA to the PGA Tour had been decided. The Ninth Circuit also had not yet cited with approval the decisions in *Tatum, Ganden,* and the earlier *Bowers* case, which applied the ADA to the NCAA. *Martin I,* 204 F.3d at 998. And the decisions in *Bowers, Cole,* and *Pryor*—each of which applied the ADA to the NCAA—had not yet been decided.

These intervening developments in the law warrant this Court's reconsideration of its prior holding.

▇ In its briefing and accompanying exhibits, Defendant NCAA in the instant case seeks to absolve itself from liability under Title III based on the argument that it does not constitute a public accommodation. The parties do not dispute two elements of Title III liability: that the operation of football stadiums affects commerce or that the NCAA is a private entity.[8] *See Nat'l Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 195, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988) (holding that NCAA is private entity even in situations where state university delegates certain authority to it). Instead, the NCAA asserts that its member institutions, not the NCAA, control university athletic facilities, including the admission prices, concession sales, and public access. However, this argument ignores the issue of whether the NCAA controls access to the playing field. As Defendant admits in its brief, "The NCAA ... regulate[s] the terms and conditions of participation in NCAA-sanctioned athletic activities." (Def.'s Mem. Opp'n Summ. J. at 7.) These terms and conditions control which members of the student body may access the football stadium's area of competitive play.[9] The Supreme Court and the Ninth Circuit have held explicitly that the ADA governs access to the playing field as well as the spectator areas of a sports arena. *Martin II,* 532 U.S. at ——, 121 S.Ct. at 1892; *Martin I,* 204 F.3d at 998. Al-

---

**8.** *But see* discussion, *infra* at IX.

**9.** In *Martin,* because the PGA Tour did actually lease and operate the golf courses during the PGA tournaments, the facts required no in-depth analysis of the degree to which the PGA Tour exercised control over the competitive areas of the courses. In the instant case, the inquiry into the NCAA's control over ac-

cess to football stadiums' areas of competitive play is necessary because the NCAA does not own or lease the stadiums during the regular football season. Therefore, the Court applies the Ninth Circuit test of whether a nexus exists between the alleged discriminatory acts and a physical place of public accommodation. *See Weyer,* 198 F.3d at 1115.

though Defendant argues that other courts applying the ADA to the NCAA have incorrectly confused " 'control' of eligibility with 'control' of the facilities" (Def.'s Opp'n to Summ. J. at 11), the Supreme Court in *Martin II* made clear that the ADA applies not only to entities governing spectators' access to a sports facility but also to those entities governing athletes' access to the competition itself.

Defendant also fails to distinguish adequately the facts of this case from other recently decided cases in which courts have found that the ADA applies to the NCAA. The exhibits submitted by the parties indicate that even though WSU controls access to the stands, concessions, and tickets, the NCAA controls which students may participate in the athletic competitions that occur on the field. Under the test the Ninth Circuit adopted in *Weyer*, the NCAA also has a sufficient nexus with actual places to subject the association to the ADA. The NCAA's policies and eligibility criteria in fact have a direct link to a place: a football stadium, which provides a place of exercise and public gathering—a public accommodation explicitly enumerated in the ADA's text. The Ninth Circuit and Supreme Court analysis in the *Martin* case requires this Court to acknowledge that control over an athletic playing field does subject a private entity to Title III of the ADA. Recent decisions from courts in other circuits also support this finding. When considering the recent change in the law, in light of the record submitted in the instant case, the Court finds that Title III of the ADA does apply to the NCAA, based upon the large degree of control the NCAA exerts over which students may access the arena of competitive college football.

## VI. DEFINITION OF "DISABILITY"

 The ADA provides the following definition of "disability":

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2) (1994). In determining whether an individual has a disability under subsection (A), courts employ a three-step inquiry: (1) does the individual suffer from a physical or mental impairment; (2) does that impairment affect a major life activity; (3) does the impairment substantially limit that major life activity. *Bartlett v. New York State Bd. of Law Examiners*, 226 F.3d 69, 79 (2d Cir. 2000). Federal regulations promulgated under the ADA indicate that mental impairments include "[a]ny mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 28 C.F.R. § 36.104 (2000). In the instant case, the parties do not dispute that Plaintiff's diagnosed learning disability constitutes a mental impairment for purposes of the ADA.

 *Substantial Limitation of Major Life Activity.* Once a plaintiff presents sufficient evidence to establish a physical or mental impairment, courts evaluate the degree to which the disability limits a major life activity. "The phrase major life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 28 C.F.R. § 36.104 (2000). The Supreme Court has emphasized the ADA's fundamental requirement that only impairments causing substantial limitations in an individual's ability to perform major life activities constitute disabilities. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565, 119

S.Ct. 2162, 144 L.Ed.2d 518 (1999). Mitigating measures, such as an individual's ability to compensate for the impairment, must be taken into account in judging whether an individual has a disability. *Id.* Determining whether a person is disabled under the ADA requires an "individualized inquiry," made on a case-by-case basis. *Thornton v. McClatchy Newspapers, Inc.,* 261 F.3d 789, 794 (9th Cir.2001). *See also Albertson's,* 527 U.S. at 566, 119 S.Ct. 2162.

The Ninth Circuit has recognized that a learning disability can constitute a disability under the ADA's definition. *Zukle v. Regents of Univ. of California,* 166 F.3d 1041, 1046 (9th Cir.1999) (parties did not dispute that medical student who needed more time to read and absorb information because of reading comprehension problems had a "disability" as defined by ADA). Other courts, in conducting individualized inquiries, have assessed the degree to which a mental impairment affects a plaintiff's ability to learn or work. *See, e.g., Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C.,* 258 F.3d 30 (1st Cir.2001) (dementia that did not substantially limit plaintiff's ability to learn or work did not constitute "disability" within meaning of the ADA); *Bowen v. Income Producing Mgmt. of Oklahoma, Inc.,* 202 F.3d 1282, 1287 (10th Cir.2000) (brain-injured plaintiff who, in spite of injury, had greater skills and abilities than average person, not considered "disabled" under ADA); *Bercovitch v. Baldwin Sch., Inc.,* 133 F.3d 141, 155 (1st Cir.1998) (attention deficit hyperactivity disorder that substantially affected learning did constitute disability under ADA); *Gonzalez v. Nat'l Bd. of Med. Examiners,* 60 F.Supp.2d 703 (E.D.Mich.1999) (medical student who scored average or superior on tests used to identify and quantify learning deficiencies not disabled under ADA because evidence showed no substantial limitation in any life activity).

■ Plaintiff presents sufficient evidence to show that he does have a learning disability. Defendant does not dispute the existence of Plaintiff's learning disability, or the fact that it substantially impairs his ability to learn. Instead, Defendant argues that Plaintiff cannot seek protection under the ADA because playing football does not constitute a major life activity. Defendant misunderstands the law on this point. Because Defendant's actions against Plaintiff resulted from his learning disability—not a disability affecting his physical capability to play football—the ADA does protect Plaintiff from discrimination based on that disability.

## VII. DISCRIMINATION AND MODIFICATIONS UNDER TITLE III

Discrimination under Title III of the ADA can manifest itself as "a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i) (1994). The statute goes on to specify practices that can amount to discrimination actionable under Title III:

[D]iscrimination includes—

(i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered;

(ii) a failure to make reasonable modifications in policies, practices, or proce-

dures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. § 12182(b)(2)(A) (1994).

The parties do not dispute that Plaintiff was denied the opportunity to participate in intercollegiate athletics at WSU, or that—absent Plaintiff's successful completion of more courses during the regular academic year—a waiver of the NCAA's 75/25 Rule would have been necessary for Plaintiff to maintain his eligibility to play football at WSU during the 1999–2000 season. The parties do, however, dispute whether Plaintiff's exclusion from the football team resulted from his learning disability or a lack of effort by Plaintiff to succeed academically. The parties also dispute whether granting the waiver requested by Plaintiff would have fundamentally altered the NCAA's purpose and athletic program.

 *Waiver of Eligibility Requirements.* A plaintiff has the burden of showing the existence of a reasonable rule modification that would enable him to participate in the subject activity. *Zukle,* 166 F.3d at 1048. Once a plaintiff meets that burden, the defendant must show that the requested modification would fundamentally alter the nature of the program or activity. *Id.* Although this Court addressed the issue of reasonable modifications in its Order denying Plaintiff's Motion for a Temporary Injunction, several courts—including the Supreme Court—have addressed the issue since then.

 In *Martin II,* 532 U.S. 661, 121 S.Ct. 1879, the Supreme Court emphasized that an evaluation of what constitutes a reasonable modification of rules for a disabled participant must focus on the individual and may not generally evaluate whether a blanket waiver of a requirement would constitute a fundamental alteration. The Court noted that a rule peripheral to the nature of a certain program might be waived in individual cases without creating a fundamental alteration. 532 U.S. at ——, 121 S.Ct. at 1893. On the other hand, the Court recognized that a modification of rules for a disabled participant might constitute a "fundamental alteration" in two ways: first, an alteration affecting an essential aspect of a defendant's policies or programs would be unacceptable even if applied to everyone equally; second, even a minor change might be unacceptable if it gave a disabled individual an advantage over others. *Id.* In the *Martin* case, both the Ninth Circuit and the Supreme Court held that permitting Casey Martin to use a golf cart, despite the PGA Tour's rule requiring participants to walk, would not fundamentally alter the nature of the competition. *Martin II,* 532 U.S. at ——, 121 S.Ct. 1879; *Martin I,* 204 F.3d at 999. The courts pointed out that the nature of the competition in golf centers on making shots, which would not be affected by Martin's use of a cart. *Id.*

A few courts recently have addressed the specific issue of reasonable accommodations for learning disabled student-athletes who cannot meet NCAA academic eligibility requirements. In *Cole v. Nat'l Collegiate Athletic Ass'n,* 120 F.Supp.2d 1060, a district court in the Eleventh Circuit held that, "Abandoning the eligibility requirements altogether for ... any athlete is unreasonable as a matter of law and is not required by the ADA." 120 F.Supp.2d at 1071–72. The plaintiff in *Cole* challenged the initial eligibility requirements for incoming student-athletes. Diagnosed with a learning disability, he

had earned a grade point average of 2.0 in his core high school courses, SAT scores of 540, 620, and 760, and an ACT score of 57; the NCAA required a minimum 2.5 core course grade point average, combined with an SAT score of at least 820 or an ACT score of at least 68. *Id.* at 1064 n. 2. The court held that requiring the NCAA to grant a waiver of its academic eligibility requirements to a student-athlete whose scores fell so far below the rules' minimums would have exceeded reasonable modifications and instead would have "essentially negated the academic eligibility standards and compromised the educational purpose of the NCAA." *Id.* at 1071. In *Cole*, the NCAA never granted the plaintiff a waiver of the initial eligibility requirements. *Id.* at 1066–67.

In *Bowers v. Nat'l Collegiate Athletic Ass'n*, 118 F.Supp.2d at 521–24, the district court found that the plaintiff's request to be exempted completely from the NCAA's individualized waiver review process would constitute a fundamental alteration to the association's policies, but the court determined that insufficient evidence had been presented on whether the requested waiver itself would present such a fundamental alteration. In *Ganden v. Nat'l Collegiate Athletic Ass'n*, 1996 WL 680000, at *14–15, another district court noted that it did "not believe that any alteration to the NCAA's eligibility requirements would 'fundamentally alter' the nature of the privilege offered," but instead that "a court must look to the underlying purposes of an eligibility requirement to determine if the modification would undermine those purposes in the circumstances of the plaintiff." In *Ganden*, the court held that a waiver of high school core course and GPA requirements would fundamentally alter the NCAA's purpose of ensuring that student-athletes are prepared to succeed at college. *Id.* at *15.

Some crucial facts in the instant case indicate that granting Plaintiff a waiver of the 75/25 Rule would not result in a fundamental alteration of the NCAA's purpose and policies. Most notably, the NCAA already has granted Plaintiff two waivers, including one waiver of the 75/25 Rule. The Court finds it difficult, particularly in light of the individualized inquiry required by *Martin*, to see how granting a third waiver to Plaintiff would fundamentally alter the NCAA's purpose, when the first two waivers did not. In cases where courts have found that a modification of NCAA rules would constitute a fundamental alteration not required by the ADA, the NCAA had never consented to grant the modification requested by Plaintiff. *See, e.g., Cole*, 120 F.Supp.2d at 1066–67; *Ganden*, 1996 WL 680000, at *15. Furthermore, the 75/25 Rule did not even exist prior to 1992; the NCAA adopted that rule long after establishing its purpose and beginning its involvement with college athletics. Plaintiff also presents evidence to show that he significantly exceeded other NCAA minimum requirements, such as the minimum grade point average and the required progression toward his degree, so waiving the 75/25 Rule would not have "essentially negated" the NCAA's mission of promoting student-athlete academic achievement.

Applying the Supreme Court's two-pronged inquiry into what would constitute a fundamental alteration, the Court finds that although doing away completely with the NCAA's academic eligibility requirements would indeed compromise the association's purpose, a waiver of the 75/25 Rule—even for all athletes—would not alter an essential aspect of the NCAA's purpose to promote academics and athleticism. The NCAA has numerous bylaws to ensure student-athletes' focus on academics. Like in the *Martin* case, neither

the game of football nor a college course of study requires students' completion of 75 percent of their coursework outside of summer school. The NCAA's mission to promote academics may be achieved through a number of policies and rules not implicated by granting Plaintiff one additional waiver of the 75/25 Rule. Furthermore, granting a waiver to Plaintiff would not result in him gaining any unfair advantage. It would merely provide a modification that would permit Plaintiff access to competitive college football at WSU while he pursues his degree in an academic program tailored to his learning disability. Applying the specific and individualized inquiry required by *Martin,* the Court finds that granting Plaintiff a waiver of the 75/25 Rule would not constitute a fundamental alteration of the NCAA's purpose.

## VIII. PLAINTIFF'S STANDING AND MOOTNESS OF ADA CLAIM

 Defendant argues that Plaintiff's ADA claim has become moot because Plaintiff is currently participating in his fourth and final year of football competition, so no relief exists for Plaintiff. In order to establish standing to bring and pursue a lawsuit, a plaintiff must establish three elements: (1) an "injury in fact," (2) a causal connection between that injury and the defendant's alleged conduct, and (3) a likelihood that the court can offer some relief for the plaintiff's injury. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A plaintiff seeking injunctive relief premised upon an alleged past wrong must demonstrate a "real and immediate threat" of repeated future harm to satisfy the injury in fact prong of the standing test. *City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

 Title III of the ADA provides only for injunctive relief. *Aikins v. St. Helena*

*Hosp.,* 843 F.Supp. 1329, 1338 (N.D.Cal. 1994). "Monetary relief is not an option for private individuals under Title III of the ADA. As a result, a plaintiff who files an ADA claim can at most hope to improve access through an injunction." *Fischer v. SJB–P.D. Inc.,* 214 F.3d 1115, 1120 (9th Cir.2000). *See also* 42 U.S.C. § 12188(a) (1994); *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 401–02, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) (construing 42 U.S.C. § 2000a–3(a), which also enumerates remedies for violations of ADA's Title III).

In the context of NCAA academic eligibility, which can change depending on a student-athlete's ongoing academic performance, this issue of standing under Title III of the ADA may present a bar to the continuation of a lawsuit where the plaintiff's claims have become moot based on subsequent NCAA action. In *Cole v. Nat'l Collegiate Athletic Ass'n,* 120 F.Supp.2d at 1067–69, the court held that the plaintiff's ADA claim had become moot because the NCAA had declared the plaintiff academically eligible to compete the following season, and no evidence justified any reasonable expectation that a wrong would be repeated. A district court in the Third Circuit evaluated a case in which the NCAA denied academic eligibility to a college athlete for her freshman year, but an NCAA bylaw permitted her four additional years to attain eligibility; the court held that because the athlete had not suffered an injury for which the court could offer any remedy, she therefore lacked standing. *Pryor v. Nat'l Collegiate Athletic Ass'n,* 2001 WL 818352 (E.D.Pa.2001). This holding followed a similar ruling in *Bowers v. Nat'l Collegiate Athletic Ass'n,* 130 F.Supp.2d at 614.

In the instant case, Plaintiff is now competing in his fourth season of intercollegiate competitive football. Plaintiff began his college career at WSU in 1997. Plain-

tiff competed on the WSU football team during the 1998 season, but the NCAA declared him ineligible at the beginning of the 1999 season. After Judge Quackenbush issued a temporary restraining order, Plaintiff participated in two football games during the 1999 season. He subsequently transferred to EWU, where he played competitive football the entire 2000 season and currently is playing in the 2001 season.

■ NCAA bylaws prohibit any student-athlete from participating in more than four seasons of intercollegiate competition in a sport. (Decl. of Paul R. Taylor, Ex. A at 7.) The NCAA bylaws permit a student-athlete to complete these four seasons of competition over a five-year period. (*Id.*) Plaintiff currently is enrolled in his fifth year of college studies and participating in his fourth season of intercollegiate football. As other courts have found in similar cases involving the NCAA, no remedy exists that this Court could offer Plaintiff. Since transferring to EWU, Plaintiff has maintained his academic eligibility and has successfully participated on the EWU football team. To grant Plaintiff an additional year of football eligibility would result in Plaintiff receiving the benefit of a full additional year of athletic participation, which no other student-athlete could receive. The ADA does not contemplate such relief. Although Plaintiff has successfully proven several elements of his ADA claim, that claim has become moot in light of Plaintiff's completion of five years of college and four years of football competition. Therefore, Plaintiff's ADA claim should be dismissed with prejudice based on Plaintiff's current lack of standing.

## IX. PLAINTIFF'S DUE PROCESS CLAIM

■ In his Complaint, Plaintiff also claims that Defendant violated his due process rights and he therefore alleges a cause of action under 42 U.S.C. § 1983. That statute provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983 (1996). In order to state a claim for relief under § 1983, a plaintiff must establish that the defendant, while acting "under color of state law," violated the plaintiff's constitutional rights. *Am. Mfr. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). This requirement excludes private conduct from § 1983 liability. *Id.* The Supreme Court has held explicitly that the NCAA is a private entity not acting under color of state law, so the association can therefore not be held liable for actions under § 1983. *Nat'l Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 198, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988).

Plaintiff's due process claim, therefore, fails as a matter of law because the NCAA has not acted under color of state law. Indeed, the parties have not disputed that the NCAA is a private entity. Furthermore, by basing his primary claim on Title III of the ADA, which only applies to private entities, Plaintiff apparently acknowledges Defendant's status as a private, rather than a public, actor. Plaintiff's due process claim should be dismissed with prejudice.

## X. WASHINGTON STATE LAW CLAIM & SUPPLEMENTAL JURISDICTION

■ *The Washington Law Against Discrimination.* In addition to alleging

claims under federal law, Plaintiff in his Complaint also seeks relief under the Washington Law Against Discrimination [WLAD]. That state law provides as follows:

> The right to be free from discrimination because of ... the presence of any sensory, mental, or physical disability ... is recognized as and declared to be a civil right. This right shall include, but not be limited to:
>
> . . . . .
>
> (b) The right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement ...

Wash. Rev.Code Ann. § 49.60.030(1) (West Supp.2001). To state a prima facie claim of disability discrimination in a public accommodation under the WLAD, a plaintiff must show that (1) he has a disability, (2) the defendant meets the definition for a place of public accommodation, (3) the defendant discriminated against the plaintiff by providing treatment different than that provided to non-disabled persons, and (4) the plaintiff's disability was a substantial factor causing the discrimination. *Duvall v. County of Kitsap,* —— F.3d ——, 2001 WL 1194976 (9th Cir. Oct. 11, 2001); *Fell v. Spokane Transit Auth.,* 128 Wash.2d 618, 911 P.2d 1319, 1328 (1996) (en banc); *Negron v. Snoqualmie Valley Hosp.,* 86 Wash.App. 579, 936 P.2d 55, 56 (1997). The WLAD's definition of "any place of public resort, accommodation, assemblage or amusement" specifically includes the following:

> ... any place ... where charges are made for admission, service, occupancy, or use or any property or facilities ... or for the benefit, use, or accommodation of those seeking health, recreation, or rest ... or where public amusement, entertainment, sports, or recreation of any kind is offered with or without charge ... or where the public gathers, congregates, or assembles for amusement, recreation, or public purposes ... or any ... educational institution ...

Wash. Rev.Code Ann. § 49.60.040(10) (West Supp.2001).

Washington state courts have noted that state law relating to disability discrimination substantially parallels federal law, and courts may look to interpretations of federal anti-discrimination laws, including the ADA, when applying the WLAD. *MacSuga v. County of Spokane,* 97 Wash. App. 435, 983 P.2d 1167, 1171 (1999) (commenting in dicta that the WLAD and ADA "have the same purpose" and state courts therefore may look to federal cases for guidance). *See also Kees v. Wallenstein,* 161 F.3d 1196, 1199 (9th Cir.1998) (holding that courts should employ the same analysis to evaluate claims under the ADA and the WLAD). The WLAD and Title III of the ADA differ in at least one respect, though. The WLAD permits plaintiffs to recover damages. Wash. Rev.Code Ann. § 49.60.030(2) (West Supp.2001).

In its Cross Motion for Summary Judgment, Defendant asserts that the Court should grant it summary judgment on Plaintiff's claim under the WLAD. Defendant cites two of the Washington cases cited above and summarily asserts the same arguments it does relating to the ADA. Although Plaintiff failed to brief the legal issues relating specifically to his WLAD claim, the evidence submitted by the parties and the Court's analysis of Plaintiff's ADA claim preclude summary judgment on the state law claim at this time; Plaintiff's claim under the WLAD is not moot, because the WLAD permits damages.

*Supplemental Jurisdiction.* Defendant asserts that this Court may not

exercise supplemental jurisdiction over Plaintiff's state law claim under the WLAD. Federal law confers jurisdiction on district courts to consider state law claims related to the claims that form original jurisdiction. 28 U.S.C. § 1367(a) (1994). The Supreme Court initially articulated the scope of district courts' authority to assert supplemental jurisdiction in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In that case, the Supreme Court held that federal courts could assert jurisdiction over state law claims when the state and federal claims derived from "a common nucleus of operative fact," the claims were such that a plaintiff would expect to try them all in one judicial proceeding, and the federal issues were substantial. *Executive Software N. Am., Inc. v. United States Dist. Court*, 24 F.3d 1545, 1552 (9th Cir.1994) (*quoting United Mine Workers*, 383 U.S. at 725, 86 S.Ct. 1130).

■■■ Under 28 U.S.C. § 1367(c)(3) (1994), a district court may decline to exercise supplemental jurisdiction over a state law claim after the court dismisses all claims over which it had original jurisdiction. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1001 (9th Cir.1997) (*en banc*) (*quoting Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). When determining whether to exercise its discretion to decline to exercise supplemental jurisdiction, a court should consider the values of judicial economy, convenience, fairness, and comity. *Acri*, 114 F.3d at 1001. The district court also has the discretion to retain supplemental jurisdiction over state law claims even after all federal claims have been dismissed.

*Schneider v. TRW, Inc.*, 938 F.2d 986, 993–94 (9th Cir.1991).

■■■ The parties in this case have never disputed that the Court had the authority to exercise supplemental jurisdiction over Plaintiff's WLAD claim while it considered his federal claim under the ADA. However, Defendant now argues that the Court should not exercise supplemental jurisdiction over Plaintiff's claim under the WLAD. Defendant argues that although the case has been exclusively in federal court for two years, the remaining state law issues—liability and monetary damages under the WLAD—have not yet been briefed or substantively raised in this court. Defendant argues that judicial economy would not be compromised by requiring Plaintiff to litigate these narrow issues in state court.

The Court agrees with Defendant's argument that any remaining claim under the WLAD would most appropriately be litigated in state court. Federal law authorizes this Court to decline to exercise supplemental jurisdiction once all federal claims have been dismissed. 28 U.S.C. § 1367(c)(3) (1994). Because the motions filed thus far have focused almost exclusively on Plaintiff's ADA claim and possible injunctive relief, the values of judicial economy, convenience to the parties, fairness, and comity would be no more advanced by retaining the case in this court than by the parties resolving the state law claim in state court. Therefore, the Court believes that Plaintiff's remaining claim should be dismissed without prejudice.

## XI. CONCLUSION

Based on the change in federal law relating to ADA claims and the NCAA, the Court finds that Title III of the ADA does apply to the NCAA, because of the extreme amount of control the association exercises over student-athletes' access to

the playing field of competitive collegiate sports. The Court also finds that Plaintiff's diagnosed learning disability substantially affects the major life activity of learning, so the ADA therefore protects Plaintiff from discrimination based on that disability. Furthermore, the Court finds that granting Plaintiff a waiver of the NCAA's 75/25 Rule, so long as Plaintiff maintains the minimum grade point average and progression toward his degree, constitutes a necessary and reasonable modification of NCAA bylaws and does not fundamentally alter the NCAA's purpose. However, the Court finds that disputed issues of material fact exist regarding the reason for Plaintiff's failure to meet the NCAA's eligibility requirements and thus whether the NCAA discriminated against him based on his learning disability. Furthermore, and most important to the outcome of the case, the Court finds that Plaintiff's ADA claim has become moot in light of the fact that he will complete his fourth and final year of eligibility with the conclusion of the current football season. The Court also finds that Plaintiff's § 1983 claim fails as a matter of law, and the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim. Accordingly,

**IT IS ORDERED** that:

1. Plaintiff's Motion for Summary Judgment, **Ct. Rec. 45**, is **GRANTED IN PART**, and Defendant's Cross Motion, **Ct. Rec. 53**, is **DENIED IN PART**, on the issues of whether Title III of the ADA applies to Defendant NCAA, whether Plaintiff's learning disability constitutes a disability protected by the ADA, and whether a waiver of the 75/25 Rule would be a reasonable modification to the NCAA's eligibility rules.

2. Plaintiff's Motion for Summary Judgment, **Ct. Rec. 45**, is **DENIED IN PART**, on the issue of whether Plaintiff's failure to meet the NCAA's eligibility criteria resulted from his disability and thus whether the NCAA discriminated against him based on his disability.

3. Defendant's Cross Motion for Summary Judgment, **Ct. Rec. 53**, is **GRANTED IN PART** on the issues of whether Plaintiff's ADA claim has become moot and whether the NCAA cannot be subject to liability under 42 U.S.C. § 1983.

4. Because the Court lacks the authority to grant Plaintiff any relief for his claimed injury under the ADA, Plaintiff's ADA claim is **DISMISSED WITH PREJUDICE.**

5. Because Plaintiff's due process allegations fail as a matter of law, Plaintiff's claim under 42 U.S.C. § 1983 is **DISMISSED WITH PREJUDICE.**

6. Because the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim, Plaintiff's claim under the WLAD is **DISMISSED WITHOUT PREJUDICE.**

The District Court Executive is directed to:

(a) File this Order;

(b) **ENTER JUDGMENT** consistent with this Order;

(c) Provide copies of this Order and the Judgment to counsel; and

(d) **CLOSE THIS FILE.**