2022 IL App (2d) 210568
No. 2-21-0568
Opinion filed August 19, 2022

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| M.U., a Minor, By and Through Her Parents, Kelly U. and Nick U., | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 21-CH-141 |
| TEAM ILLINOIS HOCKEY CLUB, INC., and THE AMATEUR HOCKEY ASSOCIATION OF ILLINOIS, INC., | ) ) ) ) | |
| | ) ) | Honorable Bonnie M. Wheaton, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Presiding Justice Bridges and Justice Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, M.U., a minor, by and through her parents, Kelly U. and Nick U., appeals the dismissal under section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2020)) of her complaint against defendants, Team Illinois Hockey Club, Inc. (Team Illinois), and the Amateur Hockey Association of Illinois (AHAI) (collectively, defendants). The complaint alleged discrimination on the basis of a disability, in violation of the Illinois Human Rights Act (Act) (775 ILCS 5/1-101 *et seq.* (West 2020)). Plaintiff argues that the circuit court erred in concluding that Team Illinois is not subject to the Act. We agree. Therefore, we reverse and remand for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3     The following facts were gleaned from plaintiff's verified complaint, which we accept as true for purposes of evaluating the circuit court's dismissal pursuant to section 2-615 of the Code. Plaintiff is a high school student and long-time player of hockey in organized hockey leagues and teams. She is also a person with a disability, in that she suffers from anxiety and depression. She has received professional medical and mental health support, and her medical providers approved and encouraged her hockey playing as a means to support her mental health. Over the years, plaintiff's mental health has benefited from the physical activity, structure, and social connections that come with playing on a hockey team.

¶ 4     Prior to the 2019-20 hockey season, plaintiff participated in public tryouts for, and later joined, the "Girls 14U [hockey] team" operated by Team Illinois. Team Illinois is an Illinois nonprofit corporation that operates youth hockey teams as part of AHAI, which is the governing body in Illinois for USA Hockey. Team Illinois offers a variety of activities and services, including club hockey teams, practices, clinics, workouts, team meals, travel opportunities, sessions to review game tape, coaching, and opportunities to play in hockey games and tournaments before family, friends, hockey scouts, and the general public. Relatedly, AHAI is an Illinois nonprofit corporation and affiliate of USA Hockey. It regulates and controls youth hockey leagues and teams throughout the state, including Team Illinois.

¶ 5     Team Illinois "leases and operates the Seven Bridges Ice Arena" (Seven Bridges) in Woodridge, in addition to other related facilities, for its activities and services. Seven Bridges is open to the public and includes "an ice rink with space for spectators, locker rooms, training facilities, concessions, offices for Team Illinois, and other related facilities." Most of Team Illinois's activities, such as hockey tryouts, practices, and games, are held at Seven Bridges.

¶ 6 On November 13, 2019, just prior to hockey practice, plaintiff and her mother informed plaintiff's coach, Larry Pedrie, that plaintiff struggled with mental health and suicidal thoughts. Plaintiff's mother also informed Pedrie that plaintiff had the support of mental health providers and she expressed that hockey was an important and supportive aspect of plaintiff's life.

¶ 7 The next day, November 14, 2019, Pedrie spoke to Mike Mullally, who is both a member of AHAI's board of directors and a director of the central district for USA Hockey. Together, they "agreed *** to banish [plaintiff] from Team Illinois until she was able to participate 100% in Team Illinois Activities." Pedrie then called plaintiff's parents and informed them that, due to her suicidal thoughts, depression, and anxiety, plaintiff was prohibited from participating in Team Illinois activities and events until she could be "cleared by a doctor to return to 100% of Team Illinois activities."

¶ 8 Team Illinois likewise "prohibited [plaintiff] from [having] any contact with Team Illinois players," and it sent an e-mail to the other players and their parents directing them to have no contact with plaintiff. The e-mail stated that plaintiff was removed from any involvement and communication with her teammates until she was back to "the positive, happy, smiling kid that we all know she is." On November 16, 2019, Pedrie reiterated in an e-mail that plaintiff was prohibited from Team Illinois activities until she could "take part 100% in all team activities," including team strength training sessions and practices, as well as attend all games and all other team functions, such as meals, meetings, and video sessions. Two days later, on November 18, 2019, plaintiff's parents had a telephone call with Mullally, who "confirmed that he and [Pedrie] had *** decided to exclude [plaintiff] from hockey" and "reaffirmed the 100% participation requirement as AHAI's position for when [plaintiff] could return to hockey."

¶ 9     Plaintiff was barred from Team Illinois activities until December 11, 2019—after her parents obtained counsel and threatened litigation. In all, plaintiff was prohibited from Team Illinois activities for just under one month. She completed the 2019-20 hockey season with Team Illinois and thereafter began playing hockey for a different youth hockey team within AHAI's purview.

¶ 10    On April 9, 2020, plaintiff filed a charge of discrimination with the Illinois Department of Human Rights (Department), asserting that defendants subjected her to discriminatory treatment because of her disability. In February 2021, after an investigation, the Department dismissed the charge because it found that the claim lacked substantial evidence.

¶ 11    On April 20, 2021, plaintiff timely filed a three-count complaint against defendants, alleging disability discrimination in violation of the Act and seeking damages and injunctive relief. See *id.* § 7A-102(D)(3) (providing that, if the Department concludes that the charge lacks substantial evidence, the complainant may "seek review of the dismissal order before the [Human Rights] Commission or commence a civil action in the appropriate circuit court"). Counts I and II alleged that Team Illinois violated the Act by denying her the full and equal enjoyment of Team Illinois facilities (including Seven Bridges) and services because of her disability or, in the alternative, that she was denied those things because she was perceived by Team Illinois to have a disability. Count III alleged that AHAI, through Mullally, "aided, abetted and/or conspired" with Team Illinois to violate the Act.

¶ 12    On July 7, 2021, defendants moved to dismiss the complaint pursuant to section 2-615 of the Code. They raised three primary arguments. First, defendants asserted that Team Illinois did not constitute a "place of public accommodation" under the Act and, as a result, the Act was inapplicable. Second, defendants argued that, even if there were an underlying violation of the Act,

the complaint did not allege any conduct by AHAI that rose to the level of aiding and abetting. Third, they asserted that permanent injunctive relief, as sought by plaintiff, was unavailable under the Act.[1] Defendants made no argument that plaintiff failed to plead that her civil rights were violated on the basis of unlawful discrimination under the Act.

¶ 13     Plaintiff responded to the motion to dismiss, arguing, pertinently, that Team Illinois was subject to the Act because it leases and operates a public ice arena, which defendants did not dispute is a place of public accommodation. In making this argument, plaintiff heavily relied on *PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001), where the United States Supreme Court held that the prohibition on disability discrimination in places of public accommodation set forth in the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 *et seq.* (2000)) applied to the tours and qualifying rounds of the Professional Golf Association (PGA).

¶ 14     The circuit court granted defendants' motion and dismissed the complaint. In explaining its ruling, the court stated:

> "I believe that [defense counsel's] arguments are well taken. The leasing of a, or for a specific amount of time, an ice rink, does not convert a private organization into a place of public accommodation. I believe that this case is so far different from the *Martin* case involving the PGA and the other cases involving the NCAA, that those cases do not apply."

The court did not reach defendants' remaining two arguments, which asserted that plaintiff failed to allege facts sufficient to support a cause of action against AHAI for aiding and abetting under the Act and that permanent injunctive relief was not available to plaintiff under the Act. Plaintiff timely filed a notice of appeal.

---

[1]Defendants do not raise this argument on appeal.

¶ 15                                    II. ANALYSIS

¶ 16    Plaintiff asserts on appeal that the circuit court erred in dismissing her complaint under section 2-615 of the Code, because she pleaded facts sufficient to allege a violation of the Act. A motion filed pursuant to section 2-615(a) challenges the legal sufficiency of the complaint based on defects apparent on its face. *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 25. In essence, the moving party states: "So what? The facts the plaintiff has pleaded do not state a cause of action against me." (Internal quotation marks omitted.) *Grant v. State*, 2018 IL App (4th) 170920, ¶ 12. In examining a section 2-615 motion to dismiss, the court must accept as true all well-pleaded facts and any reasonable inferences drawn from those facts. *O'Callaghan v. Satherlie*, 2015 IL App (1st) 142152, ¶ 18. The court must also construe the well-pleaded facts in a light most favorable to the plaintiff. *Thurman v. Champaign Park District*, 2011 IL App (4th) 101024, ¶ 8. However, the court may not accept as true conclusions of law or fact unsupported by specific allegations of fact. *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009). A section 2-615 motion to dismiss should be granted only when it is apparent that no set of facts could be proved that would entitle the plaintiff to relief. *McIlvaine v. City of St. Charles*, 2015 IL App (2d) 141183, ¶ 14. We review *de novo* an order granting a section 2-615 motion to dismiss. *Grant*, 2018 IL App (4th) 170920, ¶ 12.

¶ 17                               The Human Rights Act

¶ 18    The Act reflects an effort to secure and guarantee the rights outlined in article I, sections 17, 18, and 19, of the Illinois Constitution (Ill. Const. 1970, art. I, §§ 17-19). 775 ILCS 5/1-102(F) (West 2020). One of the stated goals of the Act is "[t]o secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her *** mental disability *** in connection with employment, real estate transactions, access to financial credit, and the

availability of public accommodations." *Id.* § 1-102(A). The Act is remedial in nature and is construed liberally to achieve its purpose. *Sangamon County Sheriff's Department v. Illinois Human Rights Comm'n*, 233 Ill. 2d 125, 140 (2009); *Arlington Park Race Track Corp. v. Human Rights Comm'n*, 199 Ill. App. 3d 698, 703-04 (1990).

¶ 19    Article 1 of the Act sets forth general provisions as well as a definitions section that is applicable to all portions of the Act. Relevant here, it defines the term "person" as "one or more individuals, partnerships, associations or organizations, labor organizations, labor unions, joint apprenticeship committees, or union labor associations, corporations, the State of Illinois and its instrumentalities, political subdivisions, units of local government, legal representatives, trustees in bankruptcy or receivers." 775 ILCS 5/1-103(L) (West 2020).

¶ 20    Articles 2 through 5 of the Act address the problem of unlawful discrimination in a specific factual context. Relevant here, article 5 governs "public accommodations." It states, pertinently, that "[i]t is a civil rights violation for any person on the basis of unlawful discrimination to" "[d]eny or refuse to another the full and equal enjoyment of the facilities, goods, and services of any public place of accommodation." *Id.* § 5-102(A).

¶ 21                      Place of Public Accommodation

¶ 22    The threshold issue presented is whether Team Illinois is subject to the Act. Although plaintiff's argument is somewhat muddled, a close examination of the complaint reveals that she identified two distinct entities that she contends are places of public accommodation that she was denied the full and equal enjoyment of: (1) Team Illinois, as a membership organization, and (2) Seven Bridges. A sampling of passages from plaintiff's appellate brief drives this point home. Plaintiff asserts that "Team Illinois cannot deny or refuse [plaintiff] the 'full and equal enjoyment' of a public hockey arena" (which we presume means Seven Bridges), and she argues that "Team

Illinois cannot deny [plaintiff] the 'full and equal enjoyment' of playing in public hockey games" (which we believe refers to Team Illinois hockey games and competitions). Plaintiff identifies the alleged discrimination as "involv[ing] [plaintiff's] equal enjoyment of facilities and services of a public accommodation: both of Seven Bridges *** and of the athletic organization Team Illinois, which is based in, leases, and operates the ice arena." She also argues that the "plain language of the Act prohibits discrimination by any person involving public accommodations[,] like a hockey arena." The duality of her argument is also a feature of plaintiff's underlying complaint. There, she alleged both that "Seven Bridges *** is a place of public accommodation under the [Act]" and that "Team Illinois, Seven Bridges ***, and other facilities used and controlled by Team Illinois are places of public accommodation." Thus, we reasonably interpret plaintiff's complaint as alleging two distinct civil rights violations under the Act—Team Illinois's denial, on the basis of unlawful discrimination, of plaintiff's full and equal enjoyment of the facilities, goods, and services of (1) Team Illinois, as a place of public accommodation, and (2) Seven Bridges, as a place of public accommodation.

¶ 23    Defendants' arguments in opposition are clearer. In broad terms, defendants assert that plaintiff failed to state a valid cause of action under the Act because she conflates her exclusion from Team Illinois *activities* (like hockey practices and games) with exclusion from the *place* of Seven Bridges. They assert that, while Team Illinois "may have deprived [plaintiff] of her association with her coaches and teammates," she was not barred from using the Seven Bridges facility. They argue that, on the contrary, plaintiff remained free to enter Seven Bridges, watch games, take skating lessons, eat in the concessions area, and skate during free skate—which put her on equal footing with every member of the general public who was not on Team Illinois. In other words, plaintiff was excluded only "from *** participating in Team Illinois activities,"

regardless of whether they occurred at Seven Bridges or elsewhere. They argued that, although Seven Bridges is open to the public, members of the public "do not have *carte blanche* to crash private events," such as Team Illinois practices and games, just because those activities may be held in a public space.

¶ 24 Just as in their motion to dismiss before the circuit court, defendants steadfastly dispute on appeal that Team Illinois is a place of public accommodation. The argument in this respect appears to be twofold. First, defendants argue the obvious—that Team Illinois, itself, is not a *place* at all but rather it is a membership organization. They assert that all of the examples of places of public accommodation listed in section 5-101(A) of the Act are physical places—none are clubs, organizations, teams, and the like. Because Team Illinois is an organization and not a physical place, defendants argue, it is not a place of public accommodation under section 5-101(A). Second, defendants argue that Team Illinois is unlike the examples listed in the Act, because the examples are all places that are open to the general public, without any prescreening or qualifications, and that provide services as if " 'one individual is no different than the next.' " See *Gilbert v. Department of Human Rights*, 343 Ill. App. 3d 904, 909 (2003) (quoting *Cut 'N Dried Salon v. Department of Human Rights*, 306 Ill. App. 3d 142, 147 (1999)). Defendants stress that membership on Team Illinois is not open to simply anyone who signs up, as would be the case for team sports offered by a local park district. Instead, membership is offered by invitation only, to select individuals who pass competitive tryouts, meet the coaches' expectations, and make the significant financial and time commitments necessary to play "in a top competitive travel [hockey] program." In short, defendants maintain that, because Team Illinois has a prescreening process, it is not truly open to the general public and, accordingly, is not a place of public accommodation.

¶ 25 The principles that guide our analysis are well established. In construing a statute, our primary objective is "to 'ascertain and give effect to the legislature's intent.' " *Hobby Lobby Stores, Inc. v. Sommerville*, 2021 IL App (2d) 190362, ¶ 20 (quoting *Lieb v. Judges' Retirement System of Illinois*, 314 Ill. App. 3d 87, 92 (2000)). Our inquiry must begin with the language of the statute itself, given its plain and ordinary meaning, which is the surest and most reliable indicator of legislative intent. *People v. Perry*, 224 Ill. 2d 312, 323 (2007). In determining the plain and ordinary meaning of statutory terms, we consider the statute in its entirety, the subject it addresses, and the apparent intent of the legislature in enacting it. *Blum v. Koster*, 235 Ill. 2d 21, 29 (2009). Where the language used is clear and unambiguous, we must apply the statute as written, without resorting to extrinsic aids of statutory construction. *DeMeester's Flower Shop & Greenhouse, Inc. v. Florists' Mutual Insurance Co.*, 2017 IL App (2d) 161001, ¶ 11. We also may not depart from the plain language of the statute by reading in any exceptions, limitations, or conditions that would frustrate the expressed intent of the legislature. *Blum*, 235 Ill. 2d at 29. With these familiar maxims in mind, we turn to the language of the Act.

¶ 26 The phrase "place of public accommodation" is not expressly defined in the Act. Instead, the Act provides a nonexclusive list of examples:

"(A) Place of Public Accommodation. 'Place of public accommodation' includes, but is not limited to:

(1) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than 5 units for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;

(2) a restaurant, bar, or other establishment serving food or drink;

(3) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(4) an auditorium, convention center, lecture hall, or other place of public gathering;

(5) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(6) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(7) public conveyances on air, water, or land;

(8) a terminal, depot, or other station used for specified public transportation;

(9) a museum, library, gallery, or other place of public display or collection;

(10) a park, zoo, amusement park, or other place of recreation;

(11) a non-sectarian nursery, day care center, elementary, secondary, undergraduate, or postgraduate school, or other place of education;

(12) a senior citizen center, homeless shelter, food bank, non-sectarian adoption agency, or other social service center establishment; and

(13) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation." 775 ILCS 5/5-101 (West 2020).

¶ 27 We agree with Team Illinois that it, as an organization, is not a "place of public accommodation" under section 5-101(A) of the Act. Foremost, neither a youth hockey team nor

any type of sports association or organization is specifically enumerated in this section of the Act. Of course, the provided examples are not an exhaustive list of what constitutes a place of public accommodation. Our supreme court has signaled that, if an entity is not expressly listed in section 5-101(A), courts should evaluate whether that particular entity nevertheless qualifies, using the interpretive canon of *ejusdem generis*. *Board of Trustees of Southern Illinois University v. Department of Human Rights*, 159 Ill. 2d 206, 211 (1994); see also *Gilbert*, 343 Ill. App. 3d at 908 ("Where the entity accused of discrimination as a place of public accommodation is not enumerated specifically in the Act, a determination must be made whether it falls into the broad definition of that term ***."); *Cut 'N Dried Salon*, 306 Ill. App. 3d at 147 (describing the use of the *ejusdem generis* canon as a "directive" from the supreme court in interpreting section 5-101(A)).

¶ 28    *Ejusdem generis* is a Latin term that means "of the same kind." Black's Law Dictionary 535 (7th ed. 1999). Under this interpretive canon, "when a statute lists several classes of persons or things but provides that the list is not exhaustive, the class of unarticulated persons or things will be interpreted as those 'others such like' the named persons or things." *Board of Trustees*, 159 Ill. 2d at 211 (quoting *Coldwell Banker Residential Real Estate Services of Illinois, Inc. v. Clayton*, 105 Ill. 2d 389, 396 (1985)), and *Farley v. Marion Power Shovel Co.*, 60 Ill. 2d 432, 436 (1975)). In other words, the "general word or phrase will be interpreted to include only persons or things of the same type as those listed." Black's Law Dictionary 535 (7th ed. 1999). By way of example, "the phrase 'other sports' in a provision referring to 'walking, swimming, biking, running, and other sports' would probably be read to exclude automobile racing." Jay Wexler, *Fun with Reverse Ejusdem Generis*, 105 Minn. L. Rev. 1, 1 (2020).

¶ 29 With the foregoing principles in mind, we conclude that "place of public accommodation" in section 5-101(A) relates to physical, tangible places. Several features of this section inform this conclusion. To begin, we observe that article 5 of the Act prohibits the denial or refusal of the full and equal enjoyment—not of a public accommodation—but rather, of a "public *place* of accommodation." (Emphasis added.) See 775 ILCS 5/5-102(A) (West 2020). The term "place" is not defined in the Act. When a term is undefined, it is assumed that the legislature intended for it to have its ordinary and popularly understood meaning. *Enbridge Energy (Illinois), L.L.C. v. Kuerth*, 2018 IL App (4th) 150519-B, ¶ 43. In such circumstance, it is appropriate to look to dictionary definitions. *In re Marriage of Zamudio*, 2019 IL 124676, ¶ 19. Webster's Dictionary defines "place" as "physical environment" or "physical surroundings." Webster's New Collegiate Dictionary 869 (1981). Indeed, Webster's Dictionary repeatedly defines "place" in terms of spatial location. Thus, a straightforward reading of section 5-102(A) reveals that it concerns the facilities, goods, and services offered by a physical place, rather than some entity that is abstract or intangible.

¶ 30 The list of illustrative examples of a "place of public accommodation" in section 5-101(A) reinforces this interpretation. This section lists 13 categories. All but one category, subpart (7), "public conveyances on air, water, or land") set out specific examples followed by a general residual, or catchall, clause. See 775 ILCS 5/5-101(A) (West 2020). For example, section 5-101(A) provides that a place of public accommodation includes, but is not limited to, "a restaurant, bar, or other establishment serving food or drink." *Id.* § 5-101(A)(2). The same is true for "a senior citizen center, homeless shelter, food bank, non-sectarian adoption agency, or other social service center establishment" (*id.* § 5-101(A)(12)), as well as for the examples listed in 10 other subparts. In total, this section specifies more than 50 examples of entities that are "place[s] of public

accommodation." These examples share a distinctive and unquestionable attribute—they all concern tangible, physical places. One may visit an inn, hotel, or motel (*id.* § 5-101(A)(1)), a restaurant (*id.* § 5-101(A)(2)), a bakery (*id.* § 5-101(A)(5)), a laundromat (*id.* § 5-101(A)(6)), a museum (*id.* § 5-101(A)(9)), or a zoo (*id.* § 5-101(A)(10)), to name just a few. Again, these are places that exist in a tangible, real-world form.

¶ 31    Likewise, the general residual clauses that follow these specific examples are also couched in terms of physical location. For example, a place of public accommodation includes "a motion picture house, theater, concert hall, stadium, or other *place* of exhibition or entertainment." (Emphasis added.) *Id.* § 5-101(A)(3). It also includes "a restaurant, bar, or other *establishment* serving food or drink." (Emphasis added.) *Id.* § 5-101(A)(2). Because the Act does not define the term "establishment," we presume that it is given its ordinary and popularly understood meaning. "Establishment" is defined, pertinently, as "a settled arrangement" or "a place of business or residence with its furnishings and staff." Webster's New Collegiate Dictionary 388 (1981). Indeed, the residual clause in each subpart in section 5-101(A), save for two, includes "establishment" or the phrase "other place" when describing the broad category to which the listed examples belong. Moreover, the categories that feature either term as a catchall utilize them as the subject of the clause. Only subparts (7) and (8) do not use either term. Subpart (8) states that a place of public accommodation includes, but is not limited to, "a terminal, depot, or other station used for specified public transportation." 775 ILCS 5/5-101(A)(8) (West 2020). Here, the word "station" serves as the catchall provision, which, like a "place" or "establishment," refers to a physical, tangible place. A "station" is "a regular stopping place in a transportation route" and "the building connected with such a stopping place." Webster's New Collegiate Dictionary 1128 (1981). Subpart (7), which lists "public conveyances on air, water, or land," no doubt refers to various means of transport. 775

ILCS 5/5-101(A)(7) (West 2020). These, too, reasonably may be construed as physical places within the meaning of section 5-101(A), albeit unfixed to a particular stationary location.[2]

¶ 32    Plaintiff offers no substantive response to defendants' argument that Team Illinois is not a place of public accommodation under section 5-101(A) of the Act. Tellingly, she fails to identify under which subpart in section 5-101(A) she believes Team Illinois qualifies as a place of public accommodation. Instead, plaintiff argues at length that the General Assembly "overturned" *Gilbert*

---

[2]Federal authority on this point is also persuasive. Although the instant matter concerns an Illinois statute, we may consider for guidance "case law relating to federal anti-discrimination statutes." *Lau v. Abbott Laboratories*, 2019 IL App (2d) 180456, ¶ 38. Several federal courts have distinguished between places of public accommodation and membership organizations. *See, e.g.*, *Elitt v. U.S.A. Hockey*, 922 F. Supp. 217, 223 (E.D. Mo. 1996) ("membership organizations such as Creve Coeur Hockey and U.S.A. Hockey do not constitute places of public accommodation" because the ADA concerns "places of public access and does not list membership organizations" (emphasis omitted)); *Brown v. 1995 Tenet ParaAmerica Bicycle Challenge*, 959 F. Supp. 496, 499 (N.D. Ill. 1997) (defendant organizations are not places of public accommodation because they are umbrella groups that organize events and "are closer in identity to a youth hockey or professional football league, which have not been found to be public accommodations"); *Stoutenborough v. National Football League, Inc.*, 59 F.3d 580, 583 (6th Cir. 1995) (the National Football League is not a "place" and therefore not a place of public accommodation). These cases, which all "dealt with member organizations *as organizations*" (emphasis in original and internal quotation marks omitted) (*Tatum v. National Collegiate Athletic Ass'n*, 992 F. Supp. 1114, 1121 (E.D. Mo. 1998)), persuasively refute plaintiff's assertion that Team Illinois is a place of public accommodation.

in 2007 by amending section 5-101(A) to largely track the definition of "public accommodation" found in the ADA (see 42 U.S.C. § 12181 (2018)).[3] In her view, the "2007 amendments overturned both *Gilbert* and all of its underlying authority," in favor of the broad interpretation of the ADA as set forth in *Martin*, 532 U.S. 661 (2001).

¶ 33    In *Gilbert*, the appellate court determined that a business offering scuba diving lessons was unlike the entities enumerated in the then-effective section 5-101(A) of the Act and thus was not a public accommodation, because the business prescreened its applicants and offered its services only to qualifying members of the public. In other words, it did not provide its services "as if one individual was no different from the next." (Internal quotation marks omitted.) *Gilbert*, 343 Ill. App. 3d at 909-10. In reaching this conclusion, *Gilbert* cited with approval *Cut 'N Dried*, 306 Ill. App. 3d at 145-47 (applying *ejusdem generis* and concluding that an insurance company is not a place of public accommodation, because it provided services only after prescreening applicants and setting premiums based on each applicant's characteristics), and *Board of Trustees*, 159 Ill. 2d at 211-12 (applying *ejusdem generis* and concluding that an academic program in a public institution is not a place of public accommodation, because the "cited establishments are examples of facilities for overnight accommodations, entertainment, recreation or transportation" and the General Assembly anticipated "a restaurant, or a pub, or a bookstore").

¶ 34    To be sure, defendants cite *Gilbert* in support of the argument that Team Illinois's selectivity and competitive prescreening process removes it from the scope of the Act as a place

---

[3]We presume that this argument is applicable only to plaintiff's assertion that Team Illinois is a place of public accommodation. This is so because the parties do not dispute that Seven Bridges constitutes a place of public accommodation under the Act.

of public accommodation. However, because we have determined that Team Illinois, itself, is not a place of public accommodation, we need not address defendants' reliance on *Gilbert* or plaintiff's argument that the General Assembly intended to abrogate *Gilbert*. While *Gilbert* and *Cut 'N Dried* assessed whether an entity is a place of public accommodation by evaluating whether the entity used a screening process and whether it provided services to the public as if any one customer is the same as the last, plaintiff offers no authority to suggest that courts are limited to only these features in applying the canon of *ejusdem generis* in evaluating the scope of section 5-101(A). As explained above, the most salient difference between Team Illinois and those entities listed in that section is that Team Illinois is not itself a physical place.[4] This feature, alone, is enough to exempt Team Illinois, the *organization*, from the definition of a place of public accommodation. Put simply, Team Illinois is not a place of public accommodation under the Act—regardless of *Gilbert*. Our analysis does not end there, however.

¶ 35    Plaintiff's second argument, as noted, is that Seven Bridges is a place of public accommodation and that Team Illinois, as a "person" under the Act (775 ILCS 5/1-103(L) (West

_____

[4]We acknowledge that, when interpreting similar language in the ADA, federal circuit courts of appeal are divided on whether a public accommodation must be a physical place. This issue has most recently surfaced in the context of evaluating whether websites are public accommodations under the ADA. See generally *National Association of the Deaf v. Harvard University*, 377 F. Supp. 3d 49, 57-60 (D. Mass. 2019) (noting that the First, Second, and Seventh Circuits hold that a public accommodation is not limited to physical structures, unlike the Third, Fifth, Sixth, and Ninth circuits, which hold that a public accommodation must be, or have a connection to, a physical place).

2020)), "denied [plaintiff] access to Seven Bridges facilities," which she alleged in her complaint is leased and operated by Team Illinois. Plaintiff frames her reliance on Seven Bridges as a place of public accommodation as "the simplest statutory analysis." This argument is similar to that offered by plaintiff in her response to defendants' motion to dismiss. There, she asserted that defendants' argument that Team Illinois is not a place of public accommodation was an "attempt to misdirect the Court and turn [the] focus to the immaterial question of whether 'Team Illinois,' *the organization*, is a 'place' of public accommodation." (Emphasis in original.) Plaintiff asserted that, regardless of whether Team Illinois is a place of public accommodation, "[d]efendants cannot dispute that Team Illinois is a 'person' (defined to include organizations) prohibited under the [Act] from 'deny[ing]' anyone 'full and equal enjoyment of places of public accommodation, like [Seven Bridges]."

¶ 36    The parties do not identify, and our research has not revealed, any Illinois case where the defendant was not also the place of public accommodation whose facilities, goods, or services were allegedly denied to the plaintiff. See *Gilbert*, 343 Ill. App. 3d at 907 (concerning "[w]hether respondent is a place of public accommodation"); *Cut 'N Dried*, 306 Ill. App. 3d at 145 (concerning "whether an insurance company falls under the purview of the [Act]" as a place of public accommodation); *Baksh v. Human Rights Comm'n*, 304 Ill. App. 3d 995, 1002 (1999) (concerning "whether a dental office is a 'place of public accommodation' "). As stressed by plaintiff, the General Assembly appears to have patterned the Act after the ADA, most notably in terms of defining what constitutes a public accommodation (compare 775 ILCS 5/5-101(A) (West 2020), with 42 U.S.C. § 12181(7) (2018)) and in prohibiting discrimination in those places (compare 42 U.S.C. § 12182(a) (2018) ("No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges,

advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."), with 775 ILCS 5/5-102(A) (West 2020) ("[i]t is a civil rights violation for any person on the basis of unlawful discrimination to" "[d]eny or refuse to another the full and equal enjoyment of the facilities, goods, and services of any public place of accommodation")). In the absence of any Illinois case involving a similar backdrop, and due to the similarity in the statutes, we may look to federal cases for guidance in construing the Act. See, *e.g.*, *In re Appointment of Special Prosecutor*, 2019 IL 122949, ¶ 54 (relying on federal law in construing Illinois's Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2012)) because "[t]he General Assembly patterned FOIA after the federal FOIA); *Owens v. VHS Acquisition Subsidiary Number 3, Inc.*, 2017 IL App (1st) 161709, ¶ 27 (looking to federal precedent in interpreting a provision in the Illinois Code of Civil Procedure, because it was patterned after a Federal Rule of Civil Procedure).

¶ 37    While Team Illinois is not, itself, a place of public accommodation, that does not necessarily mean that it is immune from liability under the Act. Indeed, persuasive federal authority is clear that athletic organizations may nevertheless be subject to civil rights laws if they exercise sufficient control over a place of public accommodation by, for example, leasing or operating the venue where its public sporting events are held. In *Martin*, 532 U.S. at 669, a professional golfer with a physical disability challenged, under the ADA, a PGA Tour rule that prohibited the use of golf carts in PGA Tour events. The threshold issue was whether the tours and qualifying rounds were subject to Title III of the ADA, which governs public accommodations. *Id.* at 675-76. In answering this question in the affirmative, the United States Supreme Court stated that it was apparent that the PGA Tour's tournaments and qualifying rounds "fit comfortably within the coverage of Title III, and [the golfer] within its protection." *Id.* at 677.

¶ 38    In support, the Court emphasized that the events occur at golf courses, which are specifically enumerated as a public accommodation under the ADA. *Id.* Additionally, the PGA Tour leased and operated the golf courses for its qualifying rounds and tours. Thus, "[a]s a lessor and operator of golf courses, then, [it] must not discriminate against any 'individual' in the 'full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations' of those courses." *Id.* (quoting 42 U.S.C. § 12182(a) (2000)). The Court explained that the "privileges" offered by the PGA Tour at golf courses were (1) the privilege to observe the competition and (2) the privilege to compete in it. *Id.* The Court stated that, although the latter privilege is "more difficult and more expensive to obtain than the former, it is nonetheless a privilege that [the PGA Tour] makes available to members of the general public." *Id.* at 680. The latter privilege was, itself, supported by the privilege of competing in a three-stage qualifying tournament known as the "Q-School," which was the most common method for a member of the general public to earn playing privileges on the tour. *Id.* at 665, 677. Thus, because the golfer qualified to play in the tour, the ADA therefore prohibited the PGA Tour from denying him equal access because of his disability. *Id.* at 677. Stated differently, the ADA prohibited the PGA Tour from discriminating against not only the spectators at its events but also the competitors themselves. *Id.* at 677, 681. In broad terms, even though the PGA Tour was a private organization and, thus, not itself a place of public accommodation, it was nevertheless subject to the ADA as a lessor and operator of a place of public accommodation—the golf course. *Id.* at 677.

¶ 39    We agree with plaintiff that the analysis of *Martin* translates directly to the instant matter. Like the PGA Tour in *Martin*, Team Illinois is a membership organization that holds competitive sporting events at a place of public accommodation. Like the PGA Tour, which conceded that "its tournaments are conducted at places of public accommodation" (*id.*), Team Illinois does not

dispute that Seven Bridges is a place of public accommodation under the Act. Neither "ice rink" nor "ice arena" is listed in the Act as an example of a place of public accommodation. Nevertheless, by application of the interpretive canon *ejusdem generis*, these places are "others such like" a golf course (also at issue in *Martin*), which is specifically listed as a place of public accommodation under the Act. See 775 ILCS 5/5-101(A)(13) (West 2020) (concerning "a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation"). Similar to the PGA Tour in *Martin*, although Team Illinois itself is not a place of public accommodation, it nevertheless is subject to the Act because, as alleged in the complaint, it barred plaintiff on the basis of her disability from participating in Team Illinois events, like hockey games and tournaments, that were held at a place of public accommodation that it leased and operated. Team Illinois, by virtue of its lease and operation of a place of public accommodation, offered the general public at least three distinct services: (1) watching Team Illinois competitions; (2) open tryouts to earn membership on the team; and (3) the opportunity to actually play in competitive hockey games as a member of the team, if selected. Like in *Martin*, even though earning a spot to play in competitive athletics for Team Illinois is distinctly more difficult and expensive than simply watching the team play, it nevertheless is a privilege that Team Illinois makes available to the public at Seven Bridges. See *Martin*, 532 U.S. at 680.

¶ 40    Defendants' attempts to distinguish *Martin* are unpersuasive. They contend that Team Illinois is "very different" from the PGA Tour because Team Illinois has no profit motive. They assert that the holding in *Martin* "was based largely on facts that are limited to highly commercialized sports organizations *** that seek to profit from public participation in their events." Defendants assert that, unlike the PGA Tour, Team Illinois does not charge admission to its games, actively seek lucrative media and advertising contracts, or exhaustively market apparel

or products. Thus, in defendants' view, Team Illinois "does not do any of the things that caused the courts to reject the [PGA Tour's] claims." Contrary to defendants' suggestion, the Supreme Court's holding in *Martin* did not turn on the PGA's profit aspirations. Although the district court had noted the PGA Tour's profit motive, it did so within the context of rejecting the argument that the PGA Tour was altogether exempt from the ADA as a private club. *Id.* at 669-70. As defendants note, the PGA Tour abandoned the argument that it was exempt as a private club in its arguments before both the Ninth Circuit and the United States Supreme Court. *Id.* at 677-78. Indeed, the business aspects of the PGA Tour were simply not mentioned in the Supreme Court's analysis of the statutory language or purpose of the ADA. See *id.* at 675-81.

¶ 41 *Martin* instructs that, once a place constitutes a "place of public accommodation," the service allegedly denied to the plaintiff need not have been available to the general public. The fact that Team Illinois is selective in choosing its members is unimportant because, under *Martin*, a facility does not lose its status as a place of public accommodation merely because entry to the field of play during athletic competitions is limited. *Id.* at 677. Accordingly, because plaintiff earned a coveted place on Team Illinois's roster, it could not then deny her on the basis of her disability the privilege of participation at athletic events held at places of public accommodation, such as Seven Bridges.

¶ 42 Federal courts have since relied on *Martin* to hold that other athletic organizations open to the public and tied to places of public accommodation are subject to the ADA. See, *e.g.*, *Matthews v. National Collegiate Athletic Ass'n*, 179 F. Supp. 2d 1209, 1223 (E.D. Wash. 2001) (stating that "control over an athletic playing field does subject a private entity to Title III of the ADA" and holding that the ADA applies to the National Collegiate Athletic Association (NCAA) "based upon the large degree of control the NCAA exerts over which students may access the arena of

competitive college football"); *Nathanson v. Spring Lake Park Panther Youth Football Ass'n*, 129 F. Supp. 3d 743, 749 (D. Minn. 2015) (holding plaintiff plausibly alleged that a youth football association operates a place of public accommodation, because it "hosts football practices, games, and social events for registered participants" held at public football fields (internal quotation marks omitted)).

¶ 43    Defendants rely on a pre-*Martin* case, *Welsh v. Boy Scouts of America*, 993 F.2d 1267 (7th Cir. 1993), to argue that federal authority supports their position. If anything, *Welsh* supports plaintiff's position. The case concerned whether a private membership organization, the Boy Scouts of America (Boy Scouts), was covered under the public accommodation provisions of Title II of the Civil Rights Act of 1964 (42 U.S.C. § 2000a (1988)). The Seventh Circuit held that the Boy Scouts were not subject to Title II because it was not "closely connected to a particular facility." *Id.* at 1269. Rather, membership in the Boy Scouts entitled a person only "to participate in group interactive activities[,] irrespective of a facility." *Id.* at 1271. In other words, Title II was inapplicable because, on summary judgment, the trial court found that the "typical Boy Scout gathering involves five to eight young boys engaging in supervised interpersonal interaction in a private home" (*id.* at 1272), which the Seventh Circuit stressed was "not the type of facility governed under Title II" (*id.* at 1274). The court also distinguished the Boy Scouts from membership organizations that were subject to public accommodation provisions by noting that, in every case where the organization was subject, it "conducted public meetings in public facilities or operated facilities open to the public like swimming pools, gyms, sports fields and golf courses." Here, plaintiff has not only asserted that Team Illinois maintains a close connection to a tangible facility that constitutes a public accommodation under the Act, but she has also alleged that it is

based in, leases, and operates that facility. These allegations were sufficient to bring Team Illinois within the scope of the Act for purposes of evaluating defendants' section 2-615 motion to dismiss.

¶ 44                    Aiding and Abetting Liability Under the Act

¶ 45    As noted, count III of plaintiff's complaint was directed against AHAI and alleged a violation of the Act based on the premise that it aided and abetted Team Illinois in unlawful discrimination. Defendants moved to dismiss count III, arguing that plaintiff failed to allege facts sufficient to establish that AHAI aided and abetted Team Illinois. In other words, defendants argued that, even if plaintiff properly alleged that Team Illinois was subject to and violated the Act, she failed to allege any conduct by AHAI that rises to the level of aiding and abetting.[5] The circuit court did not reach this issue because it agreed with defendants that Team Illinois was not subject to the Act and dismissed the complaint. Because the argument raises a legal question that the parties have briefed on appeal, and to assist the circuit court on remand, we will address it in the interest of judicial economy. See *Amalgamated Transit Union, Local 241 v. Illinois Labor Relations Board, Local Panel*, 2017 IL App (1st) 160999, ¶ 69 (addressing, in the interest of judicial economy, an issue likely to reappear on remand).

¶ 46    To state a claim against AHAI under count III, plaintiff had to allege facts to establish that there was an underlying violation of the Act and that AHAI aided, abetted, compelled, or coerced

_____

[5]We again note that defendants, in moving to dismiss counts I and II, made no argument that plaintiff failed to plead that her civil rights were violated by Team Illinois on the basis of unlawful discrimination under the Act. Because we have already determined that Team Illinois is subject to the Act, we presume for purposes of this issue that Team Illinois's actions amounted to a violation of the Act.

Team Illinois to violate the Act. 775 ILCS 5/6-101(B) (West 2020). A plaintiff adequately pleads that a defendant aided or abetted an unlawful act by alleging the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be regularly aware of his or her role as part of the overall or tortious activity at the time he or she provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation. *Grimes v. Saikley*, 388 Ill. App. 3d 802, 819 (2009).

¶ 47    We conclude that plaintiff has adequately alleged facts to support that AHAI, through AHAI board member Mullally, aided and abetted Team Illinois in violating the Act. Plaintiff alleged that, on November 14, 2019, Pedrie spoke to Mullally and, together, they agreed to exclude plaintiff from Team Illinois until she was able to fully participate in its activities. She further alleged that, four days later, her parents had a telephone call with Mullally, who "confirmed that he and [Pedrie] had *** decided to exclude [plaintiff] from hockey" and "reaffirmed the 100% participation requirement as AHAI's position for when [plaintiff] could return to hockey." Accepting these allegations as true and drawing all reasonable inferences therefrom in plaintiff's favor, as we must, they adequately present a claim against AHAI of aiding and abetting a violation of the Act. The joint decision suffices for AHAI's knowing and substantial assistance to violate the Act.

¶ 48    Defendants, on appeal, misconstrue the facts alleged in the complaint. They contend that Mullally merely "agreed with Coach Pedrie's decision" and "told [plaintiff's parents] as much during a subsequent telephone call." Defendants' argument suggests that Mullally was a passive listener who happened to agree with Team Illinois's decision. However, this argument attempts to cast the facts in the light most favorable to *defendants*, which is exactly the inverse of the appropriate inquiry in evaluating a section 2-615 motion to dismiss. As stated, Mullally did not

just "support[ ], and perhaps encourge[ ]" unlawful discrimination, as defendants argue in their brief. Instead, plaintiff alleged that Pedrie and Mullally jointly decided to remove plaintiff from the team and set the "100% participation" threshold for her return, and she alleged that Mullally informed plaintiff's parents of the joint decision during a phone call in the days following her removal, which is sufficient to plead an aiding and abetting claim against AHAI under the Act.

¶ 49                                    III. CONCLUSION

¶ 50     For the reasons stated, the judgment of the circuit court of Du Page County is reversed and the cause is remanded for further proceedings.

¶ 51     Reversed and remanded.

*M.U. v. Team Illinois Hockey Club, Inc.*, 2022 IL App (2d) 210568

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 21-CH-0141; the Hon. Bonnie M. Wheaton, Judge, presiding. |
| **Attorneys for Appellant:** | Charles D. Wysong, of Hughes, Socol, Piers, Resnick & Dym, Ltd., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Timothy D. Elliott and Heather L. Kramer, of Rathje Woodward LLC, of Wheaton, for appellees. |
| *Amicus Curiae*: | Barry C. Taylor, Rachel M. Weisberg, and Paul W. Mollica, of Equip for Equality, of Chicago, *amicus curiae*. |