2025 IL App (2d) 240399
No. 2-24-0399
Opinion filed December 10, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| MILTON REYNOLDS, Individually and on Behalf of Similarly Situated Individuals, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 23-LA-465 |
| STATE FARM LIFE INSURANCE COMPANY, and STATE FARM LIFE AND ACCIDENT ASSURANCE COMPANY, | ) ) ) ) ) | |
| | ) | Honorable |
| | ) | John G. Dalton |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Justices McLaren and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    At issue here is whether section 20(b) of the Genetic Information Privacy Act (Act) (410

ILCS 513/1 *et seq.* (West 2022)), applies to life insurance underwriting. Upon careful

consideration, we determine that it does not and therefore affirm.

¶ 2                                   I. BACKGROUND

¶ 3                                 A. Factual Background

¶ 4    On October 30, 2023, plaintiff Milton Reynolds filed this putative class action in the Kane

County Circuit Court. Reynolds's complaint raised a single cause of action arising out of the Act's

section 20(b). *Id.* § 20(b). Reynolds alleged that State Farm Life Insurance Company and State Farm Life and Accident Assurance Company (collectively "State Farm") required him (and other similarly situated individuals) to undergo a physical exam and to provide genetic personal health information (genetic PHI) to assess their eligibility for life insurance coverage. Reynolds's complaint alleged that this practice ran afoul of the Act's section 20(b), which prohibits insurers from using or disclosing "protected health information that is genetic information" for "underwriting purposes." *Id.*

¶ 5      On March 14, 2024, State Farm moved to dismiss Reynolds's complaint under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2024)). State Farm argued, *inter alia*, that section 20(b) did not apply to life insurance underwriting but rather solely to health insurance underwriting. On March 31, 2024, the trial court held a hearing on State Farm's motion to dismiss. Reasoning that section 20(b) "[t]aken as a whole, read in context, [and] giving affect [*sic*] to all of its provisions" did not apply to life insurers, the trial court granted State Farm's motion to dismiss with prejudice. This timely appeal followed.

¶ 6                    B. Summary of Parties' Main Arguments

¶ 7      Reynolds advances numerous arguments in his brief in support of his theory that the Act's section 20(b) applies to life insurance underwriting. He points first to section 20(b)'s use of the broad term "insurers"—rather than a more qualified term, such as "health insurers"—and concludes that this section regulates life insurers insofar as they meet the statutory definition of "insurer."[1] Reynolds next contrasts section 20(b)'s language with that of adjacent subsections (a)

---

[1]There was some question in the trial court whether life insurers meet the Act's statutory definition of "insurer." State Farm chooses not to argue this point. Therefore, we proceed as if life insurers meet the statutory definition.

and (c). 410 ILCS 513/20(a), (c) (West 2022). These latter subsections, Reynolds notes, explicitly limit their application to accident and health insurance, while subsection (b) contains no similar limitation. Following this, Reynolds anticipates State Farm's argument that construes subsection (b)(4) (*id.* § 20(b)(4)) as a "catch-all clause," limiting the definition of "underwriting purposes" to health insurance underwriting. See *infra* ¶¶ 17-23 (section II(C)). Reynolds stresses that, under the "last antecedent rule," the limiting language in one subpart ought to apply only to that subpart. Thus, per Reynolds, the language of subsection (b)(4)—apparently limiting the definition of "underwriting purposes"—should apply only to subsection (b)(4).

¶ 8     Reynolds's brief dives into section 20(b)'s legislative history as well. Passed in 2014, he notes that section 20(b) is unique alongside its 1998 counterparts in that it does not expressly limit its application to health and accident insurers. Reynolds contends that this was an intentional omission by the General Assembly, designed to widen section 20(b)'s applicability to all insurers. Moreover, Reynolds argues, the General Assembly based section 20(b)'s text on a similar Health Insurance Portability and Accountability Act of 1996 (HIPAA) (42 U.S.C. § 201 *et seq.* (2018)) regulation. When it did so, however, it replaced HIPAA's "covered entity" terminology (a narrow term meaning a health plan or health insurance company) with the broader term of "insurer," which likewise demonstrates the legislature's intent to cast a broad regulatory net in passing this section.

¶ 9     In its brief, State Farm seeks to counter these arguments. It stresses that, while section 20(b) regulates "insurers," an entity's status as an "insurer" is not enough to trigger section 20(b)'s regulations. Rather, an entity must be both an insurer *and* engaged in underwriting. Section 20(b)'s definition of underwriting, meanwhile, consists principally of health insurance vocabulary, such as "deductibles" and "pre-existing conditions." Terms specific to life insurance are notably absent.

¶ 10    In response to Reynolds's analysis of section 20(b)(4), State Farm emphasizes section 20(b)'s syntax of "A, B, C and other D's," and notes that under standard grammatical rules, the "other D's" phrase modifies the entire series, not just the last item of the series. The "last antecedent" rule that Reynolds forwards, State Farm points out, applies to a different type of syntax.

¶ 11    Finally, State Farm examines the legislative history of section 20(b). It demonstrates that the General Assembly added this section to modernize the Act in light of new federal regulations, which applied solely to health insurers. It notes the life insurance industry's conspicuous silence when the General Assembly was considering section 20(b) in 2014—a notable contrast to 1998, when the life insurance industry's outcry forced changes to the original law. It points also to recently introduced legislation which, if enacted, would regulate the use of genetic PHI for life insurance underwriting. Such legislation would be unnecessary, State Farm notes, if section 20(b) already applied to life insurance underwriting.

¶ 12                                    II. ANALYSIS

¶ 13                                 A. Standard of Review

¶ 14    When considering the sufficiency of a complaint under section 2-615, we must determine whether the allegations in the complaint, construed in a light most favorable to the plaintiff, are sufficient to set forth a cause of action upon which relief may be granted. *Jost v. Bailey*, 286 Ill. App. 3d 872, 877 (1997). A claim should be dismissed on the pleadings only if "it clearly appears that no set of facts can be proved under the pleadings which will entitle the plaintiff to recover." *Bryson v. News America Publications, Inc.* 174 Ill. 2d 77, 86 (1996). Because a section 2-615 motion to dismiss "challenges the legal sufficiency of a complaint based on defects apparent on its face," our review is *de novo*. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). In

examining a motion to dismiss with respect to the pleadings, the court must accept as true all well-pleaded facts and any reasonable inferences drawn from those facts. The court must also construe the well-pleaded facts in a light most favorable to the plaintiff. However, the court may not accept as true conclusions of law or fact unsupported by specific allegations of fact. *M.U. v. Team Illinois Hockey Club, Inc.* 2022 IL App (2d) 210568, ¶ 16.

¶ 15                                      B. General Principles

¶ 16    This case presents an issue of statutory interpretation. The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent. *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 509 (2007). "The best indicator of legislative intent is the plain language of the statute itself." *O'Connell v. County of Cook*, 2022 IL 127527, ¶ 21. The court should evaluate the statute as a whole, "with each provision construed in connection with every other section." *Roselle Police Pension Board v. Village of Roselle*, 232 Ill. 2d 546, 552 (2009). "Although a court should first consider the language of the statute, a court must presume that the legislature, in enacting the statute, did not intend absurdity or injustice." *Wade*, 226 Ill. 2d at 510. "Each word, clause, and sentence of a statute must be given a reasonable meaning, if possible, and should not be rendered superfluous." *Williams v. Bruscato*, 2021 IL App (2d) 190971, ¶ 13.

¶ 17                            C. Whether State Farm Created or

                            Received "Protected Health Information"

¶ 18    Section 20(b) prohibits insurers from using or disclosing "protected health information" (PHI) that is "genetic information" for underwriting purposes. 410 ILCS 513/20(b) (West 2022). The Act adopts HIPPA's definitions of both terms. *Id.* § 10 (citing 45 C.F.R. § 160.103 (2022)). "Genetic information" means, in relevant part,

        "information about:

(i) [an] individuals' genetic tests;

(ii) [t]he genetic tests of family members of the individual;

(iii) [t]he manifestation of a disease or disorder in family members of such individual; or

(iv) [a]ny request for, or receipt of, genetic services, or participation in clinical research which includes genetic services, by the individual or any family member of the individual." 45 C.F.R. § 160.103 (2022).

Reynolds contends that the information collected by State Farm meets the Act's definition of "genetic information" because it qualifies as "information about *** the manifestation of a disease or disorder in" Reynolds's family members. We agree, but this is not enough. The genetic information must *also* meet the statutory definition of PHI. Our review of this definition leads us to conclude that the information collected here does not qualify as PHI.

¶ 19    The Act defines PHI as having "the meaning ascribed to it under HIPAA, as specified in 45 CFR 16[0].103." 410 ILCS 513/10 (West 2022). HIPAA regulations define PHI as follows:

"Protected health information means *individually identifiable health information*:

(1) Except as provided in paragraph (2) of this definition, that is:

(i) Transmitted by electronic media;

(ii) Maintained in electronic media; or

(iii) Transmitted or maintained in any other form or medium." (Emphasis added.) 45 C.F.R. § 160.103 (2022).

¶ 20    The same section defines "individually identifiable health information" as:

"information that is a subset of health information, including demographic information collected from an individual, and:

(1) Is *created or received by a health care provider, health plan, employer, or health care clearinghouse*; and

(2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and

(i) That identifies the individual; or

(ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual." (Emphasis added.) *Id.*

¶ 21 Put simply, section 20(b) regulates the use and disclosure of PHI. For information to be PHI, it must also be "individually identifiable health information." Individually identifiable health information, in turn, must have been "created or received by a health care provider, health plan, employer, or health care clearinghouse." *Id.* Reynolds does not allege that State Farm is any of these things.

¶ 22 Reynolds might protest that ExamOne, which conducted the medical examination on behalf of State Farm, is itself a "health care provider" that "created" health information, thereby transforming the information it collected into individually identifiable health information and, ultimately, into PHI. Indeed, Reynolds refers to ExamOne as a "health care provider" on several occasions in its brief. However, beyond this conclusory characterization, Reynolds gives us no reason to conclude that ExamOne meets HIPAA's definition of a "health care provider," nor is that conclusion evident from the facts. See *id.* (defining health care provider). Because "health care provider" has a specific definition under the statute, finding that ExamOne meets this definition would amount to a legal conclusion. Even at this stage of proceedings, we are bound to

not accept legal conclusions "unsupported by specific allegations of fact." *Team Illinois Hockey Club, Inc.*, 2022 IL App (2d) 210568, ¶ 16.

¶ 23    Accordingly, because State Farm is not a health care provider, plan, employer, or clearinghouse, its collection and use of Reynolds's genetic information falls outside of section 20(b)'s scope. Moreover, with the facts and argument before us, we cannot conclude that ExamOne meets the definition of "health care provider." We could affirm the trial court's ruling on this basis alone. However, because doing so would leave the central question of this appeal unresolved, we continue to analyze the language of section 20(b).

¶ 24            D. Section 20(b) Applies Only to Health Insurance Underwriting

¶ 25    In relevant part, section 20(b) states as follows:

"An insurer shall not use or disclose protected health information that is genetic information for underwriting purposes. For purposes of this Section, 'underwriting purposes' means, with respect to an insurer:

(1) rules for, or determination of, eligibility (including enrollment and continued eligibility) for, or determination of, benefits under the plan, coverage, or policy (including changes in deductibles or other cost-sharing mechanisms in return for activities such as completing a health risk assessment or participating in a wellness program);

(2) the computation of premium or contribution amounts under the plan, coverage, or policy (including discounts, rebates, payments in kind, or other premium differential mechanisms in return for activities, such as completing a health risk assessment or participating in a wellness program);

(3) the application of any pre-existing condition exclusion under the plan, coverage, or policy; and

(4) other activities related to the creation, renewal, or replacement of a contract of health insurance or health benefits." 410 ILCS 513/20(b) (West 2022).

Flanking section 20(b) are subsections (a) and (c). Neither party disputes that these latter subsections apply only to accident and health insurance policies. *Id.* § 20(a), (c).

¶ 26    At the outset, we acknowledge that the language of section 20(b) lends itself to confused reading. In their pursuit of precision, this section's drafters have sacrificed clarity. The result is multiple lawsuits, thousands of dollars in legal bills, and hundreds of hours in labor, all to make sense of exactly what the above words mean. There is no rule requiring that legislatures enact opaque legislation. Our review of comparable state laws reveals that it is possible to regulate insurers and their underwriting practices without resorting to the turgid prose above. Indeed, the best constructed statutes define not only what the law does regulate, but also what it does *not* regulate. See, *e.g.*, Kan. Stat. Ann. § 40-2259(c) (West 2022) (from Kansas, "[s]ubsection (b) does not apply to an insurer writing life insurance, disability income insurance or long-term care insurance coverage"). A similar drafting approach here would have prevented the controversy before us now. Applying this approach in the future will doubtlessly forestall many similar controversies.

¶ 27    Applying the above principles of statutory interpretation, we can come to no other conclusion than this: section 20(b) applies only to health insurance underwriting. First, there is section 20(b)(4). If we do not construe this clause as a "catch-all" provision, encompassing within the definition of underwriting those activities "related to the creation, renewal or replacement of a contract for health insurance" *besides those already stated* in subsections (b)(1)-(3), what purpose could this clause serve? It cannot be that it introduces these activities to the definition of underwriting, as subsections (b)(1)-(3) are examples of health insurance-related activities falling

under subsection (b)(4)'s domain. To illustrate, imagine a statute that seeks to define the commanders-in-chief of the United States Military:

"The commanders-in-chief of the United States Military have been:

(1) George Washington;

(2) Abraham Lincoln;

(3) Franklin D. Roosevelt; and

(4) other persons who have held the office of President."

¶ 28 One cannot conclude that subsection (4) of this fictional statute merely introduces that presidents may be considered the commanders-in-chief of the United States Military. This is already known because Washington, Lincoln, and Roosevelt were all presidents. Any interpretation of subsection (4) in this manner would render it redundant. The same logic applies to the real statute before us. The presence of the word "other" in the Act's section 20(b)(4) leads us to this same conclusion. In *Williams*, 2021 IL App (2d) 190971, ¶¶ 11-12, we rejected Williams's interpretation of the phrase "willfully and intentionally failed to comply with [the Freedom of Information Act [(5 ILCS 140/1 *et seq.* (West 2018))], or otherwise acted in bad faith." (Emphasis and internal quotation marks omitted.) Williams urged an interpretation in which civil penalties could be imposed against a public body if *either* that public body willfully and intentionally failed to comply with the Act *or* if the public body acted in bad faith. *Id.* ¶¶ 12-14. ("In other words, plaintiff construes the terms 'willfully and intentionally' and 'in bad faith' as separate bases for imposing a civil penalty."). Such an interpretation, we reasoned, would render superfluous the term "or otherwise." *Id.* ¶ 14. We instead concluded that the phrase was "meant as a catchall to include *other* actions that constitute bad faith." (Emphasis in original.) *Id.* (" 'when a statute provides a list of examples followed by a catchall term *** the preceding list provides a

clue as to what the drafters intended the catchall provision to mean' " (quoting *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 883 (N.D. Cal. 2015))). The same logic applies to the present statute. Just as the statutory syntax in *Williams* meant that "bad faith" could be imputed to the term "willfully" and "intentionally," the similar syntax here means that we should impute the phrase "activities related to *** health insurance or health benefits" to all of the examples preceding it. Under this interpretation, there can be no doubt that section 20(b) does not extend to life insurers.

¶ 29     Second, the principle of *noscitur a sociis* supports this conclusion as well. Under *noscitur a sociis*, "[t]he meaning of questionable words or phrases in a statute may be ascertained by reference to the meaning of words or phrases associated with it." (Internal quotation marks omitted.) *Senese v. Village of Buffalo Grove*, 383 Ill. App. 3d 276, 279 (2008). "The classic gloss of *noscitur a sociis* is that general and specific words which are capable of an analogous meaning[,] being associated together, take color from each other, so that the general words are restricted to a sense analogous to the less general." (Internal quotation marks omitted.) *People v. Taylor*, 349 Ill. App. 3d 839, 843 (2004). Put another way, "one knows a word by the company it keeps." *Id.*

¶ 30     For example, in *Fischer v. United States*, 603 U.S. 480 (2024), the government charged a January 6th defendant under section 1512 of the Sarbanes-Oxley Act of 2002, which provides as follows:

"(c) Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined *** or imprisoned not more than 20 years, or both." 18 U.S.C. § 1512(c) (2018).

¶ 31 Because the government accused Fischer of impeding Congressional certification of the 2020 presidential election results, and not of destroying, mutilating, or concealing any object, it charged Fischer only with "otherwise obstruct[ing] *** any official proceeding" under 18 U.S.C. § 1512(c)(2). *Fischer*, 603 U.S. at 483-84. The lower court dismissed this charge, and the Supreme Court concurred. Applying *noscitur a sociis*, it interpreted the general term "otherwise obstruct" in light of its neighboring words: "record, document, or other object," and concluded that section (c)(2) "ma[de] it a crime to impair the availability or integrity of records, documents, or objects *** in ways other than those specified in (c)(1)." *Id.* at 489-91. Accordingly, Fischer's interruption of a congressional vote—without more—could not satisfy section 1512's elements.

¶ 32 Here, we must define the scope of the general phrase "underwriting purposes." To do so, we look for the company that it keeps. Section 20(b)(1) speaks of benefit eligibility based upon health assessments or wellness programs. Subsection (b)(2) again references health assessments, but this time in relation to insurance premiums. Subsection (b)(3) addresses preexisting conditions, and subsection (b)(4) pertains to "other activities" related to health insurance contracts. Every clause that follows the term "underwriting purposes" mentions health insurance or some activity related to health insurance. No clause mentions life insurance or something exclusively related to life insurance. If the general term "underwriting purposes" is to "take color" from the specific words which succeed it, we can only conclude that "underwriting purposes" means only health insurance underwriting purposes.

¶ 33    Third, a related yet distinct principle of statutory interpretation is *ejusdem generis*. This doctrine provides that "when a statutory clause specifically describes several classes of persons or things and then includes 'other persons or things,' the 'other' is interpreted as meaning 'other such like.' " (Internal quotation marks omitted.) *In re Jose A.*, 2018 IL App (2d) 180170, ¶ 32. Put another way, the "general word or phrase will be interpreted to include only persons or things of the same type as those listed." (Internal quotation marks omitted.) *Team Illinois Hockey Club, Inc.*, 2022 IL App (2d) 210568, ¶ 28. For example, "the phrase 'other sports' in a provision referring to walking, swimming, biking, running, and other [such like] sports would probably be read to exclude automobile racing." (Internal quotation marks omitted.) *Id.*

¶ 34    We agree with Reynolds that applying this doctrine is inappropriate here. We conclude this, however, because *ejusdem generis* exists to clarify ambiguities inherent to an "unarticulated" class of persons or things. See *Board of Trustees of Southern Illinois University v. Department of Human Rights*, 159 Ill. 2d 206, 211 (1994). No such ambiguity exists under section 20(b). Rather, section 20(b)(4) "articulates" the class of "other activities" as those which are "related to the creation, renewal, or replacement of a contract of health insurance or health benefits." If section 20(b)(4) instead read merely "other activities," applying *ejusdem generis* would result in us interpreting that phrase as other activities "such like" those already listed, *i.e.* other activities related to health insurance or health benefits. The statute's language is precise enough, however, that it effectively does this job for us. Accordingly, the very reason for this doctrine's inapplicability confirms that the statute defines a limited class of activities: those related exclusively to health insurance.

¶ 35                    E. Section 20(e) Does Not Support Reynolds's

Interpretation of Section 20(b)

¶ 36    The Act's section 20(e) prohibits "compan[ies] providing direct-to-consumer commercial genetic testing *** from sharing any genetic test information or other personally identifiable information about a consumer with any health or life insurance company without written consent from the consumer." 410 ILCS 513/20(e) (West 2022). This section, Reynolds insists, "close[s] a loophole by which insurers could possibly obtain genetic testing information" for life insurance underwriting purposes.

¶ 37    This section, however, contemplates that insurers *may* obtain genetic testing information, provided that the genetic testing company first obtains "written consent from the consumer." *Id.* Insofar as a *health* insurer obtains genetic information from "[a] company providing direct-to-consumer commercial genetic testing," its use is subject to section 20(c), which allows insurers to consider genetic information "if the individual voluntarily submits the results and the results are favorable to the individual." *Id.* § 20(c), (e). In contrast, a *life* insurer that receives such information is not subject to the provisions of section 20(c), nor to any comparable section pertaining specifically to life insurers. Section 20(e) is therefore illuminating, albeit not for the reasons Reynolds suggests. It demonstrates that the General Assembly contemplated that both health and life insurers would seek consumer information from genetic testing companies. Despite this knowledge, the General Assembly limited only *health insurers'* use to that which is "favorable to the individual." No such limitation exists for life insurers. This suggests the General Assembly was both aware of, and comfortable with, the broad utilization of genetic information for life insurance purposes. Accordingly, section 20(e) reinforces the conclusion that the Act's underwriting limitations apply solely to health insurers.

¶ 38                    F. Legislative History Does Not Support

Reynolds's Reading of Section 20(b)

¶ 39     To the extent this court finds the term "underwriting purposes" to be ambiguous, we may look to section 20(b)'s legislative history. *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 398 (2003). "When interpreting an ambiguous phrase in a statute, our supreme court looks especially to the remarks of the bill's sponsor." *Maschek v. City of Chicago*, 2015 IL App (1st) 150520, ¶ 62; see *Krohe*, 204 Ill. 2d at 398.

¶ 40     The General Assembly first enacted the Act in 1998. At that time, due to pressure from the life insurance industry, the Act's sponsors made plain that the legislation did not extend to life insurance. In the House, Representative Moffitt stated "[t]his legislation does not include life insurance, since our objective was to make sure there is no discrimination on other insurance, essentially health insurance and employment." 90th Ill. Gen. Assem., House Proceedings, Apr. 15, 1997, at 184 (statements of Representative Moffitt). Similarly, the Act's Senate sponsor noted: "one of the other objections was that life insurance could be a problem, that someone could be tested and find out that there's a—a long-term problem and run out and purchase life insurance without disclosing that information. *We have removed life insurance from this bill ***.*" (Emphasis added.) 90th Ill. Gen. Assem., Senate Proceedings, March 20, 1997, at 143 (statements of Senator Hawkinson).

¶ 41     Spurred by Congress's passage of the Genetic Information Nondiscrimination Act of 2008 (42 U.S.C. § 2000ff *et seq.* (2018)), the General Assembly began amending the Act to "harmonize[ ]" it with the federal statute. 95th Ill. Gen. Assem., House Proceedings, May 30, 2008, at 30 (statements of Representative Ryg). The General Assembly added section 20(b) in 2014, soon after the Department of Health and Human Services promulgated a substantively identical

regulation in accordance with the federal statute's directives. See 45 C.F.R. § 164.502(a)(5)(i) (2014). The amendment's Senate sponsor explained that the amendment's purpose was to "update[ ] laws related to the disclosure of *** genetic information to protect the disclosure of such personal health information according to *** HIPAA." 98th Ill. Gen. Assem., Senate Proceedings, May 19, 2014, at 26 (statements of Senator Hunter). It is beyond dispute that the HIPAA regulation that spurred the 2014 amendment does not apply to life insurers. See 42 U.S.C. § 300gg-53 (2018); *Thompson v. Washington National Insurance Co.*, No. 2:14-cv-00660, 2015 WL 8346166, at *2. If section 20(b) exists to harmonize Illinois law with federal law and the comparable federal regulation unambiguously does not apply to life insurers, then absent clear language to the contrary, we can only conclude that section 20(b) likewise does not apply to life insurers. To find otherwise would be to rewrite the law.

¶ 42　　Moreover, as the *amicus* brief notes, the 2014 amendment passed without any fanfare from the life insurance industry. This was in marked contrast to 1998, when lawmakers needed to repeatedly reassure life insurers that the Act would not reach their industry's long-standing practices. It strains credulity to believe that, in passing section 20(b), the General Assembly at once radically upended life-insurance underwriting practices but did so with such stealth that the law's effect escaped notice not only at the time, but for more than a decade afterward. Indeed, so esoteric must this change have been, that even lawmakers themselves were unaware of the change. See 104th Ill. Gen. Assem., House Bill 2534, 2025 Sess.; 104th Ill. Gen. Assem., Senate Bill 250, 2025 Sess. (proposing a ban on life insurers from using genetic information in their underwriting).

¶ 43　　While the plain language of the statute is sufficient to conclude that section 20(b) does not apply to life insurance underwriting, to the extent its review is necessary, the relevant legislative history confirms the statute's plain language. Against all this evidence, Reynolds urges us to

conclude that section 20(b) applies to life insurers. Because the legislature does not "hide elephants in mouseholes," we cannot accept such an interpretation. (Internal quotation marks omitted.) *People ex rel. Ryan v. Agpro, Inc.*, 214 Ill. 2d 222, 228 (2005).

¶ 44                                                III. CONCLUSION

¶ 45     For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 46     Affirmed.

*Reynolds v. State Farm Life Insurance Co.*, **2025 IL App (2d) 240399**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 23-LA-465; the Hon. John G. Dalton, Judge, presiding. |
| **Attorneys for Appellant:** | Robert A. Chapman, Robert J. Shapiro, and Shannon T. Knight, of Chapman Spingola, LLP, and Eugene Y. Turin, Andrew T. Heldut, and Jordan R. Frysinger, of McGuire Law, P.C., both of Chicago, for appellant. |
| **Attorneys for Appellee:** | Sean G. Wieber, Samantha Lerner, Kevin P. Simpson, and James W. Randall, of Winston & Strawn LLP, of Chicago, for appellees. |
| *Amicus Curiae*: | Eric S. Mattson and Ellen A. Wiencek, of Sidley Austin LLP, of Chicago, for *amicus curiae* American Council of Life Insurers. |